IN RE INTEREST OF BRETTANY M. ET AL.,
CHILDREN UNDER 18 YEARS OF AGE.
STATE OF NEBRASKA, APPELLEE, V.
BRETT W., APPELLANT.

644 N.W.2d 574

Filed May 7, 2002.   No. A-01-880.

Scott A. Calkins, of Byam & Hoarty, for appellant.

James S. Jansen, Douglas County Attorney, and Kim B. Hawekotte for appellee.

Irwin, Chief Judge, and Hannon and Inbody, Judges.

Irwin, Chief Judge.

## I. INTRODUCTION

Brett W. appeals from an order of the separate juvenile court of Douglas County, Nebraska, terminating his parental rights to Brettany M. and Cinnamon M. On appeal, Brett challenges the court's rulings concerning the admission of certain evidence and the court's finding that the State had proven by clear and convincing evidence that termination of his parental rights was in the best interests of Brettany and Cinnamon. Brett argues that the determination to terminate his parental rights was based on his incarceration. On our de novo review, we affirm the termination of Brett's parental rights.

## II. BACKGROUND

These proceedings involve the termination of Brett's parental rights to Brettany and Cinnamon. Although another child, Darius

M., was also named in the caption of the case, the issues on appeal are limited to Brettany and Cinnamon. Accordingly, we limit the factual background to a discussion of the facts as they relate to those two children.

Brettany was born August 26, 1996. Brettany suffered medical complications at birth and experienced a condition known as gastroschisis, a condition in which she was born with her intestines outside her body. As a result of this condition, Brettany spent the first few months of her life in the hospital and underwent several surgeries before she was discharged and allowed to leave the hospital. Brett testified that he spent as much time as he could, when not working, at the hospital with Brettany during this time and was in the surgery room with Brettany during her surgeries. To be able to care for Brettany's condition when she was allowed to leave the hospital, Brett underwent training and received a state license to act as a certified nursing assistant.

The evidence presented at trial indicated that after Brettany left the hospital, Brett was the primary caregiver taking care of her special needs. Specifically, Brett maintained a feeding tube necessary for feeding Brettany, was initially a stay-at-home parent for Brettany, and ultimately assisted daycare providers with Brettany's special needs.

Brettany's biological mother, Jennifer M., had a poor relationship with Brett. The parties separated numerous times, during which Brett cared for Brettany. Ultimately, Brett underwent court proceedings to establish paternity of Brettany and to be awarded legal custody of Brettany. In those court proceedings, Brett was found to be Brettany's father and was awarded custody of Brettany.

Cinnamon was born 15 months after Brettany, on November 30, 1997. Brett testified that after Cinnamon's birth, he was the primary caregiver to both Brettany and Cinnamon. When Cinnamon was approximately 6 months old, Jennifer took Cinnamon and left town for approximately 1 month without notifying Brett of their whereabouts. After this incident, Brett underwent court proceedings to establish paternity of Cinnamon and to be awarded legal custody of Cinnamon. In those court proceedings, Brett was found to be Cinnamon's father and was awarded custody of Cinnamon.

The record is undisputed that Brett was the primary caregiver for both Brettany and Cinnamon. Brett called several witnesses to testify to this fact and testified in this regard on his own behalf.

The record indicates that Brett and Jennifer were unable to live together and get along. There was apparently some altercation in July 1998, although the details of this altercation are not evident on the record. Following the July altercation, Brett underwent court proceedings and obtained a domestic violence protection order on behalf of himself and Brettany and Cinnamon, which was granted on September 1. In addition, although there is no evidence in the record to indicate that either child ever witnessed or experienced any domestic violence, the relationship between Brett and Jennifer turned violent on at least one occasion.

On November 1, 1998, there was an altercation between Brett and Jennifer. During this altercation, Brett assaulted Jennifer and caused serious bodily injury. Specifically, Brett pled no contest to a charge of first degree assault, and the factual basis for the plea indicated that Brett was observed to have "stomped" on Jennifer's head. As a result, Jennifer spent approximately 1 month in the hospital and was then released to a nursing home where she remained largely uncommunicative and unable to care for herself. The record indicates that Jennifer remained in this condition at least as of June 1999, although there was no evidence presented at trial to indicate her progress.

As a result of Brett's no contest plea, he was sentenced to a term of imprisonment of 19 to 20 years on June 18, 1999. According to the record, Brett is eligible for parole on May 11, 2008, and has a tentative release date of November 11, 2008. By the year 2008, Brettany will be approximately 11 years old and Cinnamon will be approximately 10 years old, and both will have spent more than 9 years away from Brett's care.

On November 17, 1998, an amended petition was filed alleging that Brettany and Cinnamon were within the jurisdiction of the juvenile court through the fault or habits of Brett. A second amended petition was filed on December 4, 1998, which added Darius to the pleadings. On March 4, 1999, the juvenile court entered an order finding that the children were within the jurisdiction of the court through the fault or habits of Brett.

On April 19, 1999, a disposition order was entered by the juvenile court. The court indicated that the permanency objective was reunification and ordered Brett to comply with a case plan developed by the Nebraska Department of Health and Human Services (Department). Various orders were entered after review hearings in October and November 1999 and January and April 2000.

On July 20, 2000, the State filed a motion for termination of Brett's parental rights. The State alleged that termination was appropriate pursuant to Neb. Rev. Stat. § 43-292(2) and (7) (Reissue 1998). The court entered an order terminating Brett's parental rights on July 18, 2001. The court found that termination was appropriate under both § 43-292(2) and (7) and that termination was in the best interests of Brettany and Cinnamon. This timely appeal followed.

### III. ASSIGNMENTS OF ERROR

On appeal, Brett has assigned five errors, which we consolidate for discussion to two. First, Brett asserts that the court erred in various evidentiary rulings. Second, Brett asserts that the court erred in finding clear and convincing evidence that termination of his parental rights is in the best interests of Brettany and Cinnamon; Brett argues primarily that there was not clear and convincing evidence because the State's evidence focused on his incarceration.

### IV. ANALYSIS

#### 1. ELEMENTS OF PROOF

In order to terminate parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the best interests of the children involved. *In re Interest of Clifford M. et al.*, 261 Neb. 862, 626 N.W.2d 549 (2001). Here, the State alleged and the court determined that the statutory grounds set forth in § 43-292(2) and (7) were established. On appeal, Brett has not challenged the juvenile court's finding that there was a statutory basis for termination, but has challenged the court's finding that termination was in the best interests of Brettany and Cinnamon.

## 2. STANDARD OF REVIEW

In an appeal from an order terminating parental rights, an appellate court tries factual questions de novo on the record. *In re Interest of Clifford M. et al., supra*. Appellate review is independent of the juvenile court's findings; however, when the evidence is in conflict, an appellate court may give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

In order to terminate parental rights, the State must prove by clear and convincing evidence that one of the statutory grounds enumerated in § 43-292 exists and that termination is in the child's best interests. *In re Interest of Clifford M. et al., supra*. "Clear and convincing evidence" means and is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proven. *In re Interest of Lisa W. & Samantha W.*, 258 Neb. 914, 606 N.W.2d 804 (2000); *In re Interest of Michael B. et al.*, 258 Neb. 545, 604 N.W.2d 405 (2000); *In re Interest of Joshua M. et al.*, 251 Neb. 614, 558 N.W.2d 548 (1997). Further, clear and convincing evidence is more than a preponderance of evidence, but less than proof beyond a reasonable doubt. *In re Interest of Headrick*, 3 Neb. App. 807, 532 N.W.2d 643 (1995).

## 3. EVIDENTIARY RULINGS

Brett first challenges the court's ruling on various evidentiary objections. Brett alleges that the court erred in receiving various evidence offered by the State and in not receiving various evidence offered by Brett.

### (a) Criminal Sentencing Hearing

First, Brett challenges the court's ruling that exhibit 59 was admissible. Exhibit 59 is a transcription of Brett's plea and sentencing in the criminal action concerning the first degree assault of Jennifer. When exhibit 59 was offered by the State, Brett specifically indicated "[n]o objection on foundation. We'd object on relevance." On appeal, Brett argues that the evidence "has absolutely no probative value in this case." Brief for appellant at 33. We disagree.

■ As Brett recognizes on appeal, the Nebraska rules of evidence do not apply in dispositional hearings arising under the Nebraska Juvenile Code, including hearings on applications to terminate parental rights. *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999); *In re Interest of Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999); *In re Interest of Andrew M., Jr. & Marceleno M.*, 9 Neb. App. 947, 622 N.W.2d 697 (2001); *In re Interest of Theodore W.*, 4 Neb. App. 428, 545 N.W.2d 119 (1996). The requirements of due process control in determining the type of evidence which may be used by the State in an attempt to prove that parental rights should be terminated. *Id.* In a termination proceeding, the State must provide the parents with fundamentally fair procedures. *In re Interest of Theodore W., supra.*

" ' " [I]t is obvious that fundamental due process is difficult to define. With reference to the evidence that is to be considered in a parental rights termination case, it is further obvious that in determining whether or not fundamental due process has been afforded to all persons interested in the proceedings, the Nebraska Rules of Evidence provide *a guidepost* in that determination." ' "

(Emphasis supplied.) 4 Neb. App. at 436, 545 N.W.2d at 126 (quoting *In re Interest of J.H.*, 242 Neb. 906, 497 N.W.2d 346 (1993), quoting *In re Interest of C.W. et al.*, 239 Neb. 817, 479 N.W.2d 105 (1992)). The question becomes whether the evidence is relevant based upon the broad concerns of juvenile proceedings, with the evidence rules serving as a guidepost. See *In re Interest of Theodore W., supra.*

Under Neb. Evid. R. 401, Neb. Rev. Stat. § 27-401 (Reissue 1995), evidence is relevant if it has any tendency to make the existence of any fact of consequence more or less probable than it would be without the evidence. *In re Interest of Andrew M., Jr. & Marceleno M., supra; In re Interest of Theodore W., supra.* There are two components of relevant evidence: materiality and probative value. *In re Interest of Andrew M., Jr. & Marceleno M., supra.* Materiality is defined as the relation between the propositions for which the evidence is being offered and the issues in the case. *Id.* To be probative, the evidence must tend to establish what it is that is being offered to prove. *Id.*

In the present case, the primary issue presented to the court was whether termination of Brett's parental rights was in the best interests of Brettany and Cinnamon. Thus, the issue on appeal is whether Brett was denied fundamental fairness when the court considered the transcription of his plea and sentencing on criminal charges for first degree assault of Jennifer. We conclude that this evidence was probative on the issue of Brettany and Cinnamon's best interests.

Exhibit 59 includes the factual basis for Brett's no contest plea to the charge of first degree assault. The factual basis presented by the State and accepted by the district court was as follows:

> Your Honor, the victim in this case, Jennifer . . . , and [Brett] had a prior relationship. They also had children together. And on November 1st, 1998, in the area of 2014 North 16th Street, officers were called, as well as an ambulance, because there were several witnesses to observe [Brett] stomp the head of Jennifer . . . into the ground.
>
> One of those was a Mr. Williams, who was driving a church van, taking people home from a church function that day. He observed [Brett] doing this, ran up to him and yelled for him to stop. [Brett] said go on, get out of here. Mr. Williams then ran to make sure that 911 was called. But he also observed [Brett] continue to stomp on [Jennifer]'s head. [Jennifer] was taken to the hospital in very critical condition. She had multiple contusions and hematomas. The most significant of which was diffuse brain swelling.
>
> She did eventually leave the hospital, but she is currently [as of April 2, 1999] living in a nursing home. She's not able to go to physical therapy because she doesn't respond completely to stimuli. She has to communicate solely by blinking, and sometimes she can't even do that. So I think that covers it so far as the serious bodily injury. And this assault did occur in Omaha, Douglas County, Nebraska.

Exhibit 59 also contains a transcription of Brett's sentencing for the above crime. During Brett's sentencing, Jennifer's sister testified and provided evidence of Jennifer's condition as of June 18, 1999. She testified that Jennifer was in "the hospital emergency and ICU for a month" and then was transferred to a nursing home where she remained. She further indicated that Jennifer

was unable to speak, was unable to move, had "a trache" in her throat, and had a feeding tube in her stomach. This testimony indicated Jennifer's progress more than 6 months after Brett assaulted her.

As noted, Brett's only objection to this evidence at trial was that it was not relevant. We conclude that the circumstances which led Brett to be sentenced to a prison term of nearly 20 years and which led to Jennifer's being physically incapable of parenting Brettany and Cinnamon, as well as the evidence concerning the extent of her progress in the 6 months of institutional care she received after the assault, are highly probative on the issue of whether Brettany and Cinnamon's best interests would be served by terminating Brett's parental rights. Indeed, the appellate courts of this state have specifically held that when a parent whose parental rights are at issue has been incarcerated, we do consider the nature of the crime committed, as well as the person against whom the criminal act was perpetrated. See, *In re Interest of Ditter*, 212 Neb. 279, 322 N.W.2d 642 (1982); *In re Interest of Azia B.*, 10 Neb. App. 124, 626 N.W.2d 602 (2001); *In re Interest of Theodore W.*, 4 Neb. App. 428, 545 N.W.2d 119 (1996). See, also, *In re Interest of B.A.G.*, 235 Neb. 730, 457 N.W.2d 292 (1990); *In re Interest of M.L.B.*, 221 Neb. 396, 377 N.W.2d 521 (1985). As such, this assigned error is without merit.

### (b) Testimony Concerning Bonding

Brett also challenges the court's admission of testimony from Miriam Dyson, one of the Department's caseworkers for Brettany and Cinnamon, concerning bonding between the children and Brett. Specifically, Dyson testified that she had concerns about bonding between Brettany and Cinnamon and Brett because of the lack of physical contact between Brett and the children while he is imprisoned. Dyson testified that "I believe if there is going to be significant bonding, there needs to be physical contact." Brett objected to this testimony on the basis of a lack of foundation.

On appeal, Brett argues that there was no foundation presented to establish Dyson's ability to testify concerning bonding. Brett asserts that Dyson's curriculum vitae fails to reference any particular expertise in the area of child and family development

and that no other evidence was presented concerning her expertise, training, or education relating to the issue of bonding.

Dyson testified that she had been employed by the Department for 17 years, spending the last 7 years working as a Child Protective Services worker. Dyson's curriculum vitae indicates that in addition to her years of experience working with children in the juvenile system and promoting reunification between children and parents, she has further relevant training, including in "Educational Psychology," " 'Connecting' – Family System/ Relationship Training," "Human Growth & Development," "Family Systems," "Child & Adolescent Depression," "Psychiatric Assessment of Children," and a bachelor of arts degree with majors in sociology and psychology.

Whether a witness is qualified to testify as an expert under the Nebraska Evidence Rules, which as noted above serve as a guidepost in termination of parental rights cases, is a preliminary question of admissibility for a trial court under Neb. Evid. R. 104(1), Neb. Rev. Stat. § 27-104(1) (Reissue 1995). See *In re Interest of C.W. et al.*, 239 Neb. 817, 479 N.W.2d 105 (1992). Such a determination will be upheld on appeal unless the trial court's finding is clearly erroneous. *In re Interest of C.W. et al., supra.* Based on the evidence noted above concerning Dyson's qualifications concerning children, families, and relationships, we do not find the court's determination that her opinion concerning bonding was admissible to be clearly erroneous.

### (c) Exclusion of Brett's Exhibits

Brett next asserts that the juvenile court erred in excluding several exhibits offered by Brett. Specifically, Brett offered: exhibit 65, court proceedings concerning Brett's legal proceedings to establish paternity and obtain custody of Cinnamon; exhibit 66, the Nebraska State Penitentiary policy on visitation; exhibit 70, court proceedings concerning Brett's legal proceedings to establish paternity and obtain custody of Brettany; and exhibit 71, court proceedings concerning Brett's successful legal proceedings to obtain a domestic abuse protection order against Jennifer. Each of these exhibits was excluded when the court sustained relevancy objections made by the State.

As noted above, although the strict evidence rules do not apply in termination of parental rights proceedings, the evidence

rules do serve as a guidepost in our assessment of whether fundamental fairness was afforded Brett. Our de novo review of the record indicates that each of these exhibits offered by Brett is relevant to whether the best interests of the children would be furthered by terminating Brett's parental rights. The exhibits either present evidence of Brett's relationship with the children and the lengths to which he was willing to go to parent them prior to his incarceration, or present evidence relevant to the assault that led to Brett's incarceration, or present evidence relevant to Brett's ability to provide parental guidance and nurturing while incarcerated. As such, we conclude that the juvenile court erred in not considering this evidence, and we will consider it in conducting our de novo review of the record. Accord, *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999); *In re Interest of Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999) (improper evidence ruling does not, in and of itself, constitute reversible error in de novo review).

### (d) Evidence From Prior Proceedings

Finally, Brett asserts that the court erred in considering "evidence from prior proceedings." Specifically, Brett challenges the following comments made by the judge at the conclusion of the case:

> Well, this one needs much thought, and I have to review all of these exhibits, but I've never seen such an overt and egregious act be so stepped around in a case before. Even the pleadings in this case talk about "assaultive behavior towards Jennifer . . ." and "the incident," and what this Court knows is that this was an egregious thing that happened to these children. And I have laid eyes on the mother of these children, and she is clearly disabled. I've heard testimony on that. And I recall statements over the years that I have heard, that the most important thing a man can do for his children is if he can't love their mother, he certainly should not harm their mother on behalf of his children.
>
> But these facts existed two years ago when this case was filed, and [Brett] was a part of these proceedings, and these egregious events all were in place then. And I must say,

I'm truly troubled by the timing of this process, and I'm troubled particularly in the face of what happened to the mother of these children by the father of these children, and that's not an issue. Everybody agrees to it, but nobody can really call it what it is.

Man, I don't know. There's that — I don't know. If the time were to do this, it might have passed, but I am — And I just have to make those comments, while at the same time I tell [Brett] and the State that I am going to sit and review all of this information and make my best judgment on behalf of justice and the best interests of these children.

Brett asserts that the court, in making the above comments "in addition to demonstrating a decided bias against [Brett], asserted that it has actual private knowledge concerning this case derived from its prior contact with the case, and that it is factoring that prior knowledge into its ultimate decision in this case. This is clearly impermissible." Brief for appellant at 36. Specifically, Brett asserts that the court's personal prior knowledge concerning Jennifer or this case did not provide a proper basis for the court to take judicial notice of the nature of the assault or Jennifer's condition.

We need not rule specifically on whether the juvenile court actually "considered" improper evidence based on the statements made at the conclusion of the hearing. We certainly cannot ignore that the use of such phrases as "I have laid eyes on the mother of these children, and she is clearly disabled" suggests that the court was improperly considering some prior personal knowledge because the record does not indicate that Jennifer was present during any portion of the hearing on Brett's parental rights. Additionally, the only detailed evidence concerning the nature of Brett's assault of Jennifer was contained in exhibit 59, which does not appear to have been reviewed by the court prior to the above comments being made. Nonetheless, because our review is de novo, the remedy for any such impropriety is for this court to not consider improper evidence in reviewing the record. See, *In re Interest of Natasha H. & Sierra H.*, 258 Neb. 131, 602 N.W.2d 439 (1999); *In re Interest of Kassara M.*, 258 Neb. 90, 601 N.W.2d 917 (1999).

## 4. BEST INTERESTS

Having resolved the evidentiary concerns, the primary issue before us on appeal is whether the record contains clear and convincing evidence that termination of Brett's parental rights is in the best interests of Brettany and Cinnamon. In support of Brett's assertion that the State failed to adduce clear and convincing evidence in this regard, Brett challenges various opinions given by the State's experts and argues that his incarceration alone cannot serve as the basis for terminating his parental rights. In our de novo review, we will set forth the evidence which we believe clearly and convincingly supports a finding that termination of Brett's parental rights is in the best interests of Brettany and Cinnamon.

### (a) Dr. Rick McNeese

The State presented evidence from Dr. Rick McNeese, a licensed psychologist who performed an evaluation of Brett while Brett was incarcerated at the Department of Correctional Services. Dr. McNeese indicated that he had police reports concerning Brett's assault of Jennifer as well as background information obtained from Brett himself. Dr. McNeese diagnosed Brett as suffering from polysubstance dependence, major depression, impulse control disorder, and mixed personality disorder, which includes antisocial and passive-aggressive behavior. Dr. McNeese specifically testified that these conditions would affect Brett's ability to parent Brettany and Cinnamon and would affect his ability to maintain employment and housing. Dr. McNeese further testified that although Brett verbalized a strong desire to be involved in the lives of his children, without treatment and guidance, it will be difficult for him to do so. Further, Dr. McNeese testified on cross-examination that Brett's personality type would interfere with emotional bonding, closeness, and warmth between Brett and the children, although it is possible that he can provide those things. Finally, Dr. McNeese testified that Brett's personality could lead him to commit similar harms toward the children as he did against Jennifer, although Dr. McNeese acknowledged that there is no evidence that Brett has ever before acted physically toward the children.

Brett asserts that Dr. McNeese's testimony does not provide clear and convincing evidence of best interests because Dr. McNeese acknowledged that he would ideally have liked access to more information when conducting his evaluation and because he never expressly opined regarding the best interests of the children. Nonetheless, Dr. McNeese's testimony is part of what we must consider in determining the best interests of the children.

### (b) Caseworkers

The State also presented the testimony of Dyson and Treva Jeffares Haugaard, caseworkers from the Department who have been involved with Brettany and Cinnamon's case. Haugaard was the caseworker for Brettany and Cinnamon between November 1998, when the children first entered the juvenile system, and August 1999. Haugaard testified that she had recommended termination of Brett's parental rights in August 1999 because of his incarceration and the length of his sentence and because of his failure, to that point in time, to address the issues that had led to the children's involvement in the juvenile system. Additionally, she noted the age of the children and indicated that the fact that they were very young and that it would be many years before Brett could be released from incarceration was another factor to consider. Haugaard acknowledged that she was unaware of what Brett might have done to address her concerns after August 1999.

Dyson became the caseworker for Brettany and Cinnamon in May 2000. Dyson specifically opined that Brett's parental rights should be terminated. She testified that her opinion was based on the children's need for permanency, the confusion caused for the children by what Brett did to Jennifer, the fact that Brett will be unavailable to provide for the children during his incarceration, and his mental health and substance abuse problems. Dyson testified that although Brett has been involved in some classes since being imprisoned, the risks associated with his mental health issues have not been alleviated.

Dyson acknowledged that she had not investigated whether visitation would be possible for Brett to further the physical availability of Brett to the children. Dyson also acknowledged that she was not aware of what counseling and therapy options were available for Brett, even though her opinion that his parental rights

should be terminated was based in part on his being unable to receive the services needed to rehabilitate himself. Dyson further testified that she felt that letters that Brett had written to the children were "a little more on an adult level" and that she felt that Brett should have acknowledged what he had done to Jennifer and shown some remorse. However, Brett testified that he was specifically instructed by the Department that he could not write to the children about the assault of Jennifer. Dyson further acknowledged that although she based her opinion in part on a history of violence by Brett, she was not specifically aware of any incidents of violence besides the assault of Jennifer which resulted in Brett's incarceration.

Despite the problems with Dyson's and Haugaard's testimony, both provided valid areas of concern that bear on the best interests of the children. Most significant of these is Brett's mental health and substance abuse problems, the fact that these children were very young when placed into the juvenile system and will not be able to be reunited with Brett for over 9 years because of his incarceration, and the concerns about the quality of relationship that Brett could ever develop with these children because of his incarceration.

### (c) Brett's Evidence

Brett presented a deposition of Dr. Joseph Rizzo, who was appointed by the court to perform a psychological and parenting assessment on behalf of Brett. As Brett argues in his brief on appeal, the record indicates that Dr. Rizzo had access to more background information than Dr. McNeese. Dr. Rizzo opined that there was a great sense of bonding and connection between Brett and Brettany because of Brettany's special medical needs and Brett's active role in caring for her prior to his incarceration. Dr. Rizzo determined that Brett suffered from chronic drug and alcohol problems, but that he did not have a history of physically hurting other people, aside from the first degree assault of Jennifer. Dr. Rizzo opined that the likeliness of Brett's acting out anger in violence is limited. Dr. Rizzo diagnosed Brett as suffering from schizo-affective disorder in remission, alcohol and cannabis abuse, and a personality disorder with "[s]chizo-[t]ypo and [a]ntisocial features." Dr. Rizzo opined that the assault of Jennifer was the result of a psychotic incident.

Although Dr. Rizzo testified that his diagnostic impression of Brett would not exclude Brett from being able to parent Brettany and Cinnamon, Dr. Rizzo testified that if Brett was not incarcerated and was in contact with the children, he would need to be under the care of a psychiatrist and psychologist or social worker, he would have a "fairly active" alcohol problem, and he would need an alcohol and drug abuse program, and that such supervision would be "just a given for a person with these diagnoses." Dr. Rizzo acknowledged on cross-examination that Brettany and Cinnamon need permanency and stability and that Brett cannot provide for them while he is incarcerated.

Brett also presented several character witnesses who testified concerning Brett's parenting of Brettany and Cinnamon prior to his incarceration. These witnesses generally established that Brett was the primary caregiver for Brettany and Cinnamon and that he was a loving and involved parent prior to his incarceration. These witnesses also established, however, that between 1996 and 1998, Brett and the children resided, at various times, with Jennifer and with Brett's two sisters in their various households.

Finally, Brett testified on his own behalf. Brett testified about the parenting he did prior to his incarceration and about the legal proceedings he underwent to establish paternity and obtain legal custody of Brettany and Cinnamon. Brett also testified about his relationship with Jennifer. Brett expressed remorse for the assault of Jennifer and testified about various anger management and parenting classes that he has taken in the penitentiary. Brett acknowledged that the first opportunity he will have to get out of prison will be in May 2008. On cross-examination, Brett acknowledged prior convictions for driving under the influence, resisting arrest, and being an accessory to burglary. Further, Brett did not deny that he has a history of drug and alcohol abuse.

### (d) Incarceration

As is apparent from a review of the testimony presented by both the State and Brett that is relevant to the issue of the best interests of the children, one of the most permeating factors in this case is Brett's incarceration. For this reason, Brett argues that the State has failed to meet its burden of proof because his incarceration cannot serve as the sole basis for terminating his parental

rights. Although this proposition of law is true on its face, its application to the facts of this case merits more consideration.

The Nebraska appellate courts have held, in numerous past cases, that parental incarceration may not be utilized as the sole ground for termination of parental rights. *In re Interest of Kalie W.*, 258 Neb. 46, 601 N.W.2d 753 (1999); *In re Interest of L.V.*, 240 Neb. 404, 482 N.W.2d 250 (1992); *In re Interest of B.A.G.*, 235 Neb. 730, 457 N.W.2d 292 (1990); *In re Interest of Ditter*, 212 Neb. 279, 322 N.W.2d 642 (1982); *In re Interest of Wagner and Russell*, 209 Neb. 33, 305 N.W.2d 900 (1981); *In re Interest of Azia B.*, 10 Neb. App. 124, 626 N.W.2d 602 (2001); *In re Interest of Theodore W.*, 4 Neb. App. 428, 545 N.W.2d 119 (1996). See *In re Interest of M.L.B.*, 221 Neb. 396, 377 N.W.2d 521 (1985). However, a parent's incarceration may be considered along with other factors in determining whether parental rights should be terminated. *In re Interest of B.A.G., supra*; *In re Interest of M.L.B., supra*; *In re Interest of Ditter, supra*; *In re Interest of Wagner and Russell, supra*. See *In re Interest of Kalie W., supra*.

Incarceration of a parent is not supposed to insulate an inmate from termination of his or her parental rights if the record contains the clear and convincing evidence that would support the termination of the rights of any other parent. *In re Interest of Azia B., supra*; *In re Interest of Theodore W., supra*. Further, it is proper to consider a parent's inability to perform his or her parental obligations because of imprisonment, the nature of the crime committed, as well as the person against whom the crime was perpetrated. *Id*. Such factors are all relevant in assessing parental fitness and child welfare. *Id*.

Brett's argument that his incarceration should not be viewed as a determinative factor in assessing whether the best interests of his children would be served by terminating his parental rights misapplies the proposition of law that incarceration cannot be the sole factor in terminating parental rights. What Brett fails to recognize in the present case is that Brettany and Cinnamon's best interests are not determined by *the sole fact* that he is incarcerated, but by a host of factors that are ancillary to that incarceration.

The record in the present case indicates not just that Brett was incarcerated. The record indicates that Brett was incarcerated for inflicting a violent and extremely damaging assault on Jennifer, Brettany and Cinnamon's mother. The record indicates that this brutal assault occurred when Brettany was 2 years old and Cinnamon was approximately 1 year old. The record indicates that as a result of Brett's assault of Jennifer, he has been sentenced to remain in prison at least until 2008, when Brettany will be 11 years old and Cinnamon will be 10 years old. The record further indicates that as a result of Brett's assault of Jennifer, she has been rendered physically incapable of providing any parental care and nurturing until such time as she makes a recovery, which had progressed minimally in the 6 months following the assault. The record indicates that at the very least, Brett's assault of Jennifer substantially interfered with her ability to be a parent to the children. The record also indicates that because of Brett's incarceration, he is unable to have significant physical conduct and foster bonding with Brettany and Cinnamon during their very young years.

The record further indicates that Brett suffers from a variety of mental health and personality disorders which require ongoing treatment, counseling, and therapy. The record indicates that even when Brett is able to be released from prison, ongoing treatment, counseling, and therapy will be necessary for him to be capable of parenting Brettany and Cinnamon. The record indicates that Brett's mental health and personality disorders will affect his ability to parent and his ability to maintain housing and employment.

Although Brett is viscerally correct in noting that the majority of these factors are related to the fact that he is incarcerated, Brett fails to recognize the difference between these factors being related to incarceration and his parental rights being terminated solely because he is incarcerated. A review of the cases cited above indicates that although termination cannot be based solely on the fact that a parent has been incarcerated, courts may consider the attendant circumstances which are occasioned by incarceration. When the aggregate of these circumstances indicates clearly and convincingly that the children's best interests dictate termination of parental rights, such is proper.

In *In re Interest of Kalie W.*, 258 Neb. 46, 50, 601 N.W.2d 753, 756 (1999), the Supreme Court noted and considered the fact that the father's incarceration "ma[de] it nearly impossible for him to provide for any of Kalie's needs." In *In re Interest of B.A.G.*, 235 Neb. 730, 735, 457 N.W.2d 292, 297 (1990), the Supreme Court noted that the father's actions which resulted in incarceration were "every bit as voluntary as if he had purchased a ticket for a 6-, 7-, or 8-year trek into Siberia" and that the father had just as effectively placed himself in a position where he could not possibly offer his presence, care, love, protection, maintenance, and opportunity for displaying parental affection. In *In re Interest of M.L.B.*, 221 Neb. 396, 377 N.W.2d 521 (1985), the Supreme Court held that the mother's law violations and the resulting period of incarceration had substantially contributed to her daughter's spending most of her life in foster care. In *In re Interest of Ditter*, 212 Neb. 279, 322 N.W.2d 642 (1982), the Supreme Court recognized that other jurisdictions have supported the termination of parental rights in cases where the actions of one parent have resulted in the death of another spouse. In *In re Interest of Azia B.*, 10 Neb. App. 124, 626 N.W.2d 602 (2001), this court upheld a finding of best interests where the primary factor was that the length of time the father would be incarcerated would prevent him from being able to support his daughter emotionally, psychologically, mentally, and physically and nurture her.

In the present case, Brett's incarceration has similarly made it nearly impossible for him to provide for any of Brettany and Cinnamon's needs. This situation will continue for the first 10 or 11 years of their lives. By severely assaulting Jennifer, Brett has effectively placed himself and Jennifer in a position where they cannot possibly offer their presence, care, love, protection, maintenance, and opportunity for displaying parental affection. As a result of his actions and the resulting period of incarceration, Brett has substantially contributed to Brettany and Cinnamon's spending much of their young lives in foster care. Although Brett's assault fortunately did not result in Jennifer's death, the record indicates that the assault was very severe, that he stomped on her head, and that she has suffered debilitating injuries as a result of the assault.

Brett's conduct which led to his incarceration, the length of incarceration, and the fact that this brutal assault was against Jennifer have seriously impaired any possibility of having these children placed in his care. Much like the appealing father in *In re Interest of Kylie W., supra*, Brett cannot now complain that he does not have the opportunities to provide for the children because of his incarceration when it was his own conduct that placed him in a position where he could not care for Brettany and Cinnamon. Perpetrating a severe assault of Jennifer, Brettany and Cinnamon's mother, is obviously not in Brettany and Cinnamon's best interests.

Beyond the specific nature of Brett's actions and the victim of his actions, the record is undisputed that Brett suffers from mental health and personality disorders which require continuing treatment and which will affect his ability to parent even when he is finally released from prison. Nebraska jurisprudence holds, generally, that it is in a child's best interests that a final disposition be made without delay. *In re Interest of M.L.B., supra*. The courts will not gamble with the child's future and will not make children await uncertain parental maturity. *Id.* The primary consideration is the best interests of the children, and the aggregate of the evidence in this case clearly and convincingly establishes that termination of Brett's parental rights is in the best interests of Brettany and Cinnamon.

## V. CONCLUSION

We find no merit to Brett's appeal. Upon a de novo review of the record, there is clear and convincing evidence that termination of Brett's parental rights is in the best interests of Brettany and Cinnamon. The juvenile court's order terminating Brett's parental rights is affirmed.

AFFIRMED.