IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF VIVIAN S.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF VIVIAN S., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE AND CROSS-APPELLEE,

V.

BRIAR S., APPELLANT, AND JULIET B., APPELLEE AND CROSS-APPELLANT.

Filed August 5, 2025.    No. A-24-774.

Appeal from the County Court for Buffalo County: GERALD R. JORGENSEN, JR., Judge. Affirmed.

Carson K. Messersmith, of Klein, Brewster, Brandt & Messersmith, for appellant.

Jeffrey P. Ensz, of Lieske, Lieske & Ensz, P.C., L.L.O., for appellee and cross-appellant Juliet B.

Mandi J. Amy, Deputy Buffalo County Attorney, and Leah Gleason, guardian ad litem, for appellee State of Nebraska.

RIEDMANN, Chief Judge, and MOORE and WELCH, Judges.

RIEDMANN, Chief Judge.

## I. INTRODUCTION

Briar S. appeals, and Juliet B. cross-appeals, from the order of the county court for Buffalo County, sitting as a juvenile court, terminating their parental rights to their minor child, Vivian S. For the following reasons, we affirm.

- 1 -

## II. BACKGROUND

Juliet is the biological mother of Vivian, born in July 2022. Briar's paternity of Vivian was not established until January 12, 2024.

In November 2022, the Department of Health and Human Services (DHHS) received an intake which alleged Juliet was improperly supervising and physically neglecting Vivian. It was reported that Juliet was not providing care for Vivian, would get upset and yell at her, and "would hand Vivian off to anyone that was around."

DHHS made contact with Juliet in December 2022. Juliet, Vivian, and Juliet's boyfriend were living in the basement of a home occupied by other individuals. A safety assessment was performed which deemed Vivian conditionally safe with a safety plan in place. This safety plan required Juliet and Vivian to move from their current address, because the owner of the home who provided occasional care for Vivian was involved with DHHS for unrelated reasons and had pending criminal charges for sexual assault of a child.

Per the safety plan, Juliet and Vivian were to move in with Briar's mother, Melissa S., with whom they had stayed the month prior. However, when DHHS contacted Melissa the next day, Melissa informed her that Juliet had left Vivian in Melissa's care and returned to live with her boyfriend. DHHS deemed Vivian to be unsafe on December 14, 2022, and because Melissa did not pass the background check, Vivian was placed on a 48-hour police hold.

On December 16, 2022, the State filed a petition claiming that Vivian lacked proper parental care by the fault or habits of Juliet under Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016) and was at risk for harm. Vivian's father was listed as "unknown" in the petition. The State simultaneously filed a motion for temporary custody, which was granted. After a few weeks in her initial foster home, Vivian was removed and placed with Juliet's mother, Beatriz H., with whom she resided for the pendency of the case.

In January 2023, the State amended its petition to include an allegation that Vivian had tested positive on December 16, 2022, for exposure to methamphetamine, after being removed from Juliet's care. Later that month, pursuant to a plea agreement, the petition was again amended to allege that Vivian lacked proper parental care by no fault of Juliet. In exchange, Juliet pled no contest to the amended petition and the court entered an order adjudicating Vivian as a child within the meaning of § 43-247(3)(a).

At a dispositional hearing in March 2023, the court received a case plan for Juliet effective from February to August. One of Juliet's safety goals was to show she could provide safe and stable housing and meet Vivian's basic needs before reunification could be achieved. Specifically, Juliet was to show she could provide for Vivian's safety and well-being by providing age-appropriate parenting and managing her own mental health needs. The plan identified strategies to achieve this goal including Juliet undergoing a drug and alcohol evaluation, completing a parenting class, regularly attending therapy, partaking in medication management, working with family support to obtain employment and safe and stable housing, and participating in supervised visitation with Vivian and bringing all basic necessities such as diapers, wipes, and bottles. The record shows DHHS was providing Juliet with supervised visitation at Beatriz's home 4 days a week.

The court found the case plan was reasonably related to the rehabilitation objective and ordered Juliet to comply with its terms. Juliet's case plan goals remained the same throughout the entirety of the case.

At this same hearing, the court received a DHHS report which listed Briar as the putative father of Vivian. It stated that he was not listed on Vivian's birth certificate and had never signed an acknowledgement of paternity; however, DHHS continued to provide efforts to Briar. Melissa had apparently also informed DHHS that Briar desired to establish paternity. However, Briar had not undergone a genetic test to establish paternity "due to his circumstances of being in prison."

According to a DHHS report received at a June 2023 hearing, in May, a supervised visitation worker reported that Juliet stated she has "scary thoughts" when Vivian is screaming. Juliet shared, "I think about how easily I could snap her neck, or sometimes I want to drown her, or even bash her head in with a toy. I even think about burning her. I just want her to stop screaming." After the incident report, supervised visitation was reduced by 1 day a week. The State also filed a motion requesting the court order a psychological evaluation and parenting assessment, which was granted.

A foster care review recommendations report was completed in August 2023, which found Juliet's mental health was the biggest barrier to reunification. It also found that Juliet was either not compliant, or only partially compliant, with the case plan goals. For example, although she had completed the required parenting class in May, she was not consistently demonstrating new skills and often handed Vivian to visitation workers to soothe. The report also included the results of a reunification assessment completed in May which found reunification would be "unsafe" and the risk level was "very high."

In October 2023, a DHHS report received by the court at a review hearing explained that, in September, Sunday visitation had been discontinued because two different transportation companies terminated Juliet due to the number of no-call no-shows. DHHS added Saturday visitation, but Juliet had not attended since it was implemented.

In January 2024, the permanency goal was changed to reunification with a concurrent goal of adoption. Briar was present at this hearing, and the court found that Briar's paternity as to Vivian had been established.

At an April 2024 exception hearing, the court received a case plan DHHS had developed for Briar. The case plan safety goal required that Briar provide a safe and stable environment evidenced by maintaining a clean home and ensuring that Vivian's basic needs were met. The "Priority Need" identified was that Briar would need to demonstrate he is able to safely parent Vivian as evidenced by successfully completing all programming with his incarceration and building a bond with Vivian by providing for her needs. Strategies to achieving this included Briar completing all requirements of his incarceration, attending visitation, and demonstrating the ability to provide Vivian with shelter, food, and clothing. However, DHHS had decided not to start visitation between Briar and Vivian.

The court also received a DHHS report which stated, as of April 8, 2024, Juliet had refused help from family support workers in completing her case plan goals, was still unemployed, and was living in the same house Vivian was removed from. Juliet did, however, begin attending regular counseling starting that month. She also had one medication management appointment in

December 2023 but had stopped taking her medication in January 2024. The court found no exception existed.

In June 2024, the State filed a motion to terminate both Briar's and Juliet's parental rights. The motion alleged that, as to Briar, grounds for termination existed under Neb. Rev. Stat. § 43-292(2), (6), (7) and (9) (Reissue 2016). As to Juliet, it was alleged grounds for termination existed under § 43-292(2), (6), and (7). Both parents entered denials to the claims.

A termination trial was held in September 2024. Multiple witnesses testified including the psychologist who performed Juliet's psychological evaluation and parenting assessment, Dr. Theodore DeLaet, the DHHS child and family services specialist assigned to Vivian's case, Bailey Hilbers, Beatriz, and Briar.

### 1. TERMINATION OF BRIAR'S PARENTAL RIGHTS

Hilbers testified Briar was incarcerated at the time she was assigned to Vivian's case in December 2022. Because of his incarceration, DHHS had been unable to provide services other than options counseling, and Hilbers was unaware of other services available to an incarcerated parent. Further, although Briar had expressed a desire to have visits with Vivian, Hilbers had not explored the possibility of facilitating them while he was incarcerated. Also, because of Vivian's age and lack of relationship with Briar, it had been determined video visitation was not in her best interests.

However, Hilbers had phone calls with Briar, another DHHS worker met with him monthly at the prison, he participated in family team meetings, and he took some parenting classes through the prison. Hilbers was unaware of any attempts by Briar to send Vivian cards, letters, or gifts, nor had he asked Hilbers to do so. In Hilbers' opinion, although Briar had done everything within his control to meet his case plan goals, it would be in Vivian's best interests to terminate Briar's parental rights due to the fact he had not provided for her during the entirety of the case.

The State also introduced certified copies of the court records from Briar's convictions. The evidence showed, on July 6, 2022, Briar was sentenced to a period of incarceration of 16 to 17 years. The records reflect that Briar had pled no contest to third degree sexual assault of a child and, in another case, he had pled no contest to an amended charge of first degree sexual assault, wherein he was at least 19 years of age or older and the victim was between 12 and 16 years old. His projected release date was February 4, 2030, and he would become eligible for parole July 30, 2029.

Briar testified on his own behalf to the following. He had only met Vivian during court, but he wanted to have visits and establish a relationship with her. He had never been offered any opportunity to have contact with Vivian. Briar was employed while incarcerated and had not had any issues or consequences during his time at the correctional facility, such as the loss of good time.

Following trial, the court terminated Briar's parental rights to Vivian. The court ultimately found, although Briar had not been given the opportunity to work a case plan or avail himself of services, the State had proven grounds existed to terminate Briar's parental rights under § 43-292(7) and (9). It explained on the record that Vivian could not be made to wait for him to be released from incarceration and termination of his parental rights was in Vivian's best interests.

## 2. TERMINATION OF JULIET'S PARENTAL RIGHTS

Juliet did not testify at trial or call any witnesses on her behalf.

The State called DeLaet who testified that he completed Juliet's psychological evaluation and parenting risk assessment in October 2023. He stated the results of the evaluation indicated that Juliet was at moderate risk to engage in future child maltreatment and neglect.

A copy of DeLaet's evaluation was admitted into evidence. The evaluation showed Juliet had reported that she did not need assistance or treatment for mental health because "I don't like people telling me what to do . . . I have my own routines." She further indicated that she recalled attending a parenting class but told DeLaet "I went but I can't remember what I learned."

Moreover, the evaluation revealed that Juliet had personality characteristics that are "risk elevating in nature." DeLaet observed strong dependency needs, noting that Juliet "doesn't work, doesn't drive, doesn't have a driver's license and relies on boyfriends to take care of her."

DeLaet opined that Juliet's statement that Vivian's screaming made her want to physically harm Vivian indicated her emotional state was unstable. He stated that Juliet's failure to continue taking medications for her mental health demonstrated impaired judgment, a voluntary lack of follow-through, or poor problem-solving abilities, which raised a concern about how she may deal with Vivian's care.

Beatriz testified Vivian was a "very shy, timid baby" when she first came to live with Beatriz at 5 months old. Initially Vivian never cried, did not like to be cuddled, and was "completely blank." However, Vivian now loved to be cuddled, smiled, and was happy. Vivian was also meeting her developmental milestones.

According to Beatriz, she and the other people living in her home would try to stay out of the way during visits but, due to Juliet's past comments concerning wanting to hurt Vivian and Juliet's asking for help controlling Vivian, they tried to give her some support. Throughout the case, Juliet had never called Beatriz or asked for updates concerning Vivian's well-being and had never attended Vivian's doctor appointments despite being welcome to do so.

Hilbers testified there were consistent concerns with Juliet's inability to meet case plan goals. A July 2024 report showed that, in June, Juliet informed DHHS she had started living with Melissa, had obtained employment, and that she had begun taking her medication. However, Hilbers had not received an update to confirm this.

Further, for the majority of the case, DHHS reports stated that Juliet continued to live at the same home Vivian was removed from, and, although Juliet had previously reported being hired for two different jobs, Hilbers had never been able to confirm this. Moreover, Juliet did not start consistent counseling until April 2024, and, although family support services was supposed to assist Juliet in accomplishing case goals, Juliet was placed on hold in November 2023 for lack of participation. At the time of trial, Juliet was not participating in family support, and she had informed Hilbers that she did not want the services because "she does not like people telling her what to do."

Due to Juliet's comments about wanting to hurt Vivian, visitation with Vivian decreased from 4 days per week to 3 days per week. Then, because Juliet was discharged by two different transportation companies because of no-call no-shows, visitation was decreased again to only 2 days per week. Hilbers testified that, in the normal progression of a case, it would be ideal to

increase, rather than decrease, frequency of visitation. When Juliet was later asked if she would like to increase her visitation time with Vivian, she refused without stating her reasoning.

The record further indicates that visits were discontinued between September 26, and November 23, 2023, because Juliet did not communicate with DHHS that she had been discharged from one of these transportation companies. Juliet was ultimately responsible for approximately 27 canceled visits between December 2022 and September 2024.

Hilbers testified that visits were held at Beatriz's home because Vivian was young and had all her necessities there. DHHS also preferred the parent travel to the child for visitation to minimize the amount of time the child would spend in a vehicle. There were consistent concerns with Juliet being able to independently provide necessary items for Vivian's care which weighed in favor of having visits at Beatriz's home. Visitation workers' reports admitted into evidence showed Juliet consistently relied on others to help care for Vivian during visits, and that she consistently used Beatriz's bottles, formula, food, and diapers during visits. DHHS' reports dated March and June 2023 noted that Juliet had been told there were vouchers she could use to obtain baby supplies, but she never picked them up.

Further, even though Juliet claimed that Beatriz's home was an uncomfortable or conflictual environment, she had been told she was able to take Vivian out into the community or have part of the visitation at another location but had chosen not to. Juliet had also explicitly told Hilbers that she appreciated Beatriz's help in calming Vivian down during visits.

Hilbers concluded that it was in Vivian's best interests to terminate Juliet's parental rights because Vivian had been in DHHS' custody for 20 months, Juliet had not made progress in the case, and she was unable to parent Vivian for long periods.

Following the termination trial, the court stated that nothing had changed regarding Juliet in the 2 years since the case began. It explained that Juliet had not increased visits with Vivian over the 2 years, Juliet did not attend some scheduled visitation, and Beatriz tended to help her to some degree. The court recognized that, although Juliet had made some improvements near the end of the case, Vivian could not be made to wait in foster care until Juliet was of sufficient maturity to parent her. The court found the State had proven grounds existed for termination of Juliet's parental rights under § 43-292(2), (6), (7), and (9) and termination was in Vivian's best interests.

## III. ASSIGNMENTS OF ERROR

Briar assigns, restated and reordered, (1) the court's finding that Vivian had been in out-of-home placement for 15 of the most recent 22 months violated his fundamental right to due process of law and (2) the court erred in finding that termination of his parental rights was in Vivian's best interests.

Juliet's cross-appeal assigns that the court erred in finding termination of her parental rights was in Vivian's best interests.

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings; however, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the trial court observed the witnesses

and accepted one version of the facts over the other. *In re Interest of Xandria P.*, 311 Neb. 591, 973 N.W.2d 692 (2022).

## V. ANALYSIS

For a juvenile court to terminate parental rights under § 43-292, it must find that one or more of the statutory grounds listed in this section have been satisfied and that such termination is in the child's best interests. See *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022). The State must prove these facts by clear and convincing evidence. *Id.*

The best interests of the child require termination of parental rights when a parent is unable or unwilling to rehabilitate himself or herself within a reasonable period of time. See *In re Interest of Leyton C. & Landyn C.*, 307 Neb. 529, 949 N.W.2d 773 (2020). Permanency is in a child's best interest because children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015).

But that is not all. A parent's right to raise his or her child is constitutionally protected; so, before a court may terminate parental rights, the State must also show that the parent is unfit. See *In re Interest of Nicole M.*, 287 Neb. 685, 844 N.W.2d 65 (2014). Parental unfitness has been defined as "a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and which caused, or probably will result in, detriment to a child's well-being." *In re Interest of Noah C.*, 306 Neb. 359, 370, 945 N.W.2d 143, 151 (2020) (quoting *In re Interest of Jahon S., supra*). Although the best interests analysis and the parental fitness analysis are separate, fact intensive inquiries, each examines essentially the same underlying facts. See *In re Interest of Brelynn E.*, 30 Neb. App. 723, 972 N.W.2d 442 (2022).

### 1. BRIAR'S APPEAL

#### (a) Statutory Grounds

Briar argues the court's finding that grounds existed to terminate his parental rights under § 43-292(7) violated his due process rights because his incarceration and lack of knowledge of his paternity prevented his involvement in the matter. He asserts that it cannot be held against him that Vivian was out of the home for 15 or more of the most recent 22 months when he was involved in the matter for only 9 months prior to his parental rights being terminated.

The State alleged, and the court found, that termination of Briar's parental rights was warranted pursuant to § 43-292(7) and (9). If an appellate court determines that the trial court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. See *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

Section 43-292(9) states that the court may terminate all parental rights when it finds that "[t]he parent of the juvenile has subjected the juvenile or another minor child to aggravated circumstances, including, but not limited to, abandonment, torture, chronic abuse, or sexual abuse." There were clearly sufficient grounds to terminate Briar's parental rights under § 43-292(9), as the evidence showed he had subjected another minor child to sexual abuse. We therefore need not address Briar's argument that the court violated his due process rights by finding

sufficient grounds existed to terminate his parental rights under § 43-292(7). See *In re Interest of Becka P. et al., supra.*

(b) Best Interests

Briar argues that the State failed to prove by clear and convincing evidence that he is an unfit parent. He alleges that the voluntary nature of his incarceration should not be held against him because he was unaware that he was Vivian's father at the time he committed the crime, and he therefore did not knowingly place himself in a position to be unable to parent her. Also, he contends that, from the time paternity was established, he sought visitation and a relationship with Vivian, but that DHHS offered him no services. Ultimately, he asserts that without a reasonable chance to avail himself of services and without reasonable assistance from DHHS, termination of his parental rights was not in Vivian's best interests.

The court acknowledged that Briar had not been able to avail himself of services; hence, it declined to terminate his parental rights based on § 43-292(6). Rather, if found termination was in Vivian's best interests based not only upon the length of time she would be required to wait for Briar's release from incarceration, but also because "the circumstances for which [Briar is] in there are very aggravated, involving sexual assaults of minor children."

The evidence is clear and convincing that Briar sexually assaulted not just one, but two children, which weighs heavily in determining Vivian's best interests. The Nebraska Supreme Court has stated, "[I]n our view, the abuse of any child by an adult—regardless of whether it is the adult's own child or the child of another—calls that adult's ability to parent into serious question." *In re Interest of Ryder J.*, 283 Neb. 318, 327, 809 N.W.2d 255, 262 (2012). Despite the absence of the crimes' details in our record, it is clear Briar was convicted of sexually penetrating a minor child resulting in a conviction of first degree sexual assault, and of having sexual contact with another minor resulting in a conviction of third degree sexual assault.

Although parental incarceration may not be utilized as the sole ground for termination of parental rights, a parent's incarceration may be considered along with other factors in determining whether parental rights should be terminated. See *In re Interest of Brettany M. et al.*, 11 Neb. App. 104, 644 N.W.2d 574 (2002). Courts may consider the attendant circumstances which are occasioned by incarceration. See *id.* When the aggregate of the attendant circumstances indicates clearly and convincingly that the child's best interests dictate termination of parental rights, such is proper. See *id.* It is proper to consider a parent's inability to perform parental obligations because of imprisonment, the nature of the crime committed, as well as the person against whom the criminal act was perpetrated. See *id.* See also *In re Interest of Joezia P.*, 30 Neb. App. 281, 968 N.W.2d 101 (2021).

Here, when considering the child-related sexual crimes of which Briar was convicted, along with the length of his incarceration, we agree the evidence is clear and convincing that it is in Vivian's best interests that Briar's parental rights be terminated.

Due to Briar's incarceration and Vivian's young age, no father-daughter bond has been established between the two of them. However, even if Briar were able to establish a relationship with Vivian through visitation, there is no question that he will not be available to parent her for many years to come. Vivian cannot be denied permanency awaiting Briar's release from

incarceration. For these reasons, we conclude the evidence is clear and convincing that Briar is unfit and it is in Vivian's best interests that his parental rights be terminated.

## 2. JULIET'S CROSS-APPEAL

### (a) Statutory Grounds

Although Juliet does not raise it as an error on appeal, per our de novo review, we first consider whether statutory grounds existed to terminate her parental rights before addressing Vivian's best interests.

The State alleged, and the juvenile court found, that termination of Juliet's parental rights was warranted pursuant to § 43-292(2), (6), and (7). Section 43-292(7) states that the court may terminate all parental rights between the parents and a juvenile when the court finds that "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." This section operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. See *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

Vivian had been in foster care since December 2022. Accordingly, at the time the State filed to terminate Juliet's parental rights in June 2024, Vivian had been out of the home for approximately 18 months. There was thus clear and convincing evidence that Vivian had been in out-of-home placement for 15 or more months of the most recent 22 months, as is required to terminate Juliet's parental rights under § 43-292(7). Because we agree that termination of parental rights is appropriate under § 43-292(7), we need not further address the sufficiency of the evidence to support termination under any other statutory ground. See *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

### (b) Best Interests

Juliet assigns the court erred in finding termination of her parental rights was in Vivian's best interests and asserts the State failed to prove by clear and convincing evidence she was an unfit parent. She contends that the circumstances of visitation did not present a reasonable opportunity to increase visits because of the distance between Juliet and the foster placement and the "conflict-ridden environment in which the visits occurred." Brief for cross-appellant at 10. Juliet also asserts that the evidence showed she and Vivian had a positive relationship but Beatriz's ability to cancel visitation and interrupt the visits obstructed reunification efforts. We disagree.

Juliet claims the supervised visitation environment was "conflict-ridden" and impacted her ability to show progress throughout the case. *Id*. However, the evidence showed that Beatriz's involvement was helpful and appreciated by Juliet, and that Beatriz predominately attempted to stay out of the way during visits. Additionally, although Juliet was supposed to provide the necessary items during visits, she frequently relied on Beatriz to provide bottles, diapers, and wipes. Moreover, Juliet had the option to have visitation elsewhere but never requested this opportunity.

Over the course of the case, visitation was decreased from 4 to 2 days per week, and there were recurrent concerns about the consistency of visits. Although Juliet argues Beatriz's ability to cancel visitation was a barrier to reunification, Juliet was responsible for the majority of

cancellations throughout the case. Furthermore, Juliet declined the opportunity for increased visitation without explanation.

Aside from the fact that visitation never progressed beyond supervised visits, there were many aspects of the case plan that Juliet failed to achieve. She completed a drug and alcohol evaluation in July 2023, which recommended that she participate in therapy, but did not begin regularly attending therapy until April 2024. She also completed the required parenting class but failed to consistently implement the skills taught. Although Juliet twice reported being hired for employment, she never provided confirmation. And, although Juliet had reportedly moved in with Melissa in June 2024, the record indicates that for nearly 2 years after Vivian's removal, Juliet continued to live in the home from which Vivian was removed and where reunification would not be possible. Juliet refused the assistance of family support services in finding housing or employment, saying she did not like being told what to do.

Juliet's comments regarding wanting to physically injure Vivian led DeLaet to opine Juliet was mentally unstable and the foster care recommendations report identified Juliet's mental health as the biggest barrier to reunification. However, Juliet has failed to consistently attend counseling or take her prescribed medication. Juliet expressed that she did not want help with her mental health because she did not like being told what to do. Contrary to Juliet's assertion that there would have been no physical safety concerns if she had unsupervised visits, her unwillingness to care for her own mental health needs indicates a potential risk of Vivian's needs being neglected.

The evidence demonstrates that Juliet is unfit, and that termination of her parental rights is in Vivian's best interests. Juliet failed to accomplish many of the case plan goals. Although Juliet made some progress near the end of the case, it was not sufficient to warrant reunification. Last-minute attempts by parents to comply with the rehabilitation plan do not prevent termination of parental rights. *In re Interest of Alec S.*, 294 Neb. 784, 884 N.W.2d 701 (2016).

Vivian cannot be made to languish in foster care awaiting Juliet's parental maturity. See *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). Because at the time of trial Vivian had already been in foster care for 20 months, and Juliet has not shown that Vivian can be safely returned to her care, we find it is in Vivian's best interests to terminate Juliet's parental rights.

## VI. CONCLUSION

For the foregoing reasons, we affirm the order of the juvenile court terminating Briar's and Juliet's parental rights to Vivian.

AFFIRMED.