IN RE INTEREST OF STEVEN JON RASMUSSEN, ALLEGED TO BE A
MENTALLY ILL DANGEROUS PERSON.
STATE OF NEBRASKA, APPELLEE, V. STEVEN JON RASMUSSEN,
APPELLANT.
462 N.W.2d 621

Filed November 16, 1990.     No. 89-1306.

Thomas M. Kenney, Douglas County Public Defender, and Brian S. Munnelly for appellant.

Ronald L. Staskiewicz, Douglas County Attorney, and Marjorie A. Records for appellee.

HASTINGS, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, GRANT, and FAHRNBRUCH, JJ.

FAHRNBRUCH, J.

Appellant, Steven Jon Rasmussen, seeks to set aside his involuntary civil commitment to a mental health facility. We reverse, and remand the cause with directions to vacate the commitment.

We first note that appellant's brief fails to assign any specific error. Appellant's sole assignment of error recites: "The District Court erred in affirming the Mental Health Board's Commitment Order." Such "generalized and vague assertions do not advise this court of the issues submitted for decision." *Coyle v. Janssen*, 212 Neb. 785, 786, 326 N.W.2d 44, 45 (1982). In such a circumstance, the decision appealed from will be affirmed unless this court elects to note plain error. *Reynolds v. Meyers*, 224 Neb. 509, 398 N.W.2d 722 (1987); *In re Interest of P.W.*, 224 Neb. 197, 397 N.W.2d 36 (1987); *Coyle v. Janssen, supra*. See, also, *Russell v. Norton*, 229 Neb. 379, 427 N.W.2d 762 (1988); Neb. Rev. Stat. § 25-1919 (Reissue 1989); Neb. Ct. R. of Prac. 9D(1)d (rev. 1989).

In Rasmussen's case, we find there was plain error as a matter of law, since the record fails to support by clear and convincing evidence that Rasmussen was a danger to himself or others at the time he was involuntarily committed by the Douglas County Mental Health Board (Board).

After a commitment hearing, the Board announced its finding that Rasmussen was a mentally ill person who was dangerous to himself and/or other people. Rasmussen appealed that decision to the district court for Douglas County. In affirming the Board's commitment, that court found that

Rasmussen . . . is mentally ill and dangerous to himself and others. [Rasmussen's] conduct on the day in question at the time of his detainment by law enforcement officers shows to the Court that the plaintiff does not have the mental capacity to safely take care of his basic needs without proper medication which he has refused to take in the past, and the evidence *indicates there is a strong possibility* that he will continue this practice in the future.

(Emphasis supplied.) Rasmussen timely appealed to this court.

A district court's review of an appeal from a mental health board is de novo on the record. A final order of the district court is appealed to the Nebraska Supreme Court in accordance with the procedure in criminal cases. Neb. Rev. Stat. § 83-1043 (Reissue 1987). In reviewing a district court's judgment under the Nebraska Mental Health Commitment Act, Neb. Rev. Stat. §§ 83-1001 et seq. (Reissue 1987 & Cum. Supp. 1988), the Supreme Court will affirm the district court's judgment unless, as a matter of law, the judgment is unsupported by evidence which is clear and convincing. *In re Interest of Adams*, 230 Neb. 109, 430 N.W.2d 295 (1988); *In re Interest of Kennebrew*, 224 Neb. 885, 402 N.W.2d 264 (1987).

In reviewing a decision from a mental health commitment hearing, a court should remember that in determining whether a person is dangerous, the focus must be on the subject's condition *at the time of the hearing*, not the date the subject of the commitment hearing was initially taken into custody. See, *In re Interest of McDonell*, 229 Neb. 496, 427 N.W.2d 779 (1988); *In re Interest of Blythman*, 208 Neb. 51, 302 N.W.2d 666 (1981). Actions and statements of a person alleged to be mentally ill and dangerous which occur prior to the hearing are probative of the subject's present mental condition. However, in order for a past act to have any evidentiary value, it must form some foundation for a prediction of future dangerousness and be, therefore, probative of that issue. *Id.*

The record reflects that on April 1, 1989, Omaha Police Officer Kris R. Jacobson responded to a disturbance call that a man was inhabiting a sewer drain. Jacobson testified that upon his arrival near the sewer drain, he observed Rasmussen, dressed only in pants, running down a hill toward the roadway upon which Jacobson had arrived. (Rasmussen was also wearing shoes when he was taken to Douglas County Hospital for emergency admittance.) Rasmussen stopped in the middle of the roadway when he saw Jacobson. Jacobson then left his police cruiser, approached Rasmussen, identified himself as a police officer, and asked Rasmussen to put his hands where he could see them. Rasmussen ignored this request and instead put both of his hands in his pockets and proceeded to remove some keys and coins and toss them onto the roadway. Jacobson repeated his request, and again Rasmussen ignored it.

As Jacobson approached, Rasmussen jumped onto the back of a moving UPS (United Parcel Service) truck. As the truck passed, Jacobson pulled Rasmussen from the truck. The officer then placed Rasmussen on the ground, handcuffed him, and placed him in the police cruiser.

City workers, who had called the police and had pointed out Rasmussen, told Jacobson where they first saw appellant, and at that place a briefcase with some clothing, personal effects, bank papers, a Bible, and an Iowa identification were found.

When asked his name, Rasmussen, while in the cruiser, responded "Steve" and cooperated with Jacobson. During the conversation, Rasmussen was asked where he resided, and he responded "Council Bluffs, Iowa," but became emotional as he described how his stepfather and mother allegedly swindled him out of his house and money. Rasmussen would not sit still. He turned completely sideways and went down to the cruiser floor on his knees despite being handcuffed from behind. Jacobson put Rasmussen back onto the seat and asked him to sit up so the two could continue their conversation. Jacobson, in an attempt to assess Rasmussen's situation, continued to ask the appellant background questions. Instead of responding, Rasmussen continued to cry and kept telling Jacobson about his stepfather's taking his house and money. Later, Rasmussen said that he had been in the military, where he used drugs, and

said he was dishonorably discharged after having been accused of selling drugs. When asked what branch of the military he had been in, Rasmussen responded that "the military was the military and he had been programmed to kill."

When asked if he had any previous mental institutionalization, Rasmussen said that he had been institutionalized (2 years earlier) in Clarinda, Iowa. When asked whether he would voluntarily commit himself, Rasmussen responded that he knew the plan, he was "like Houdini," he had been there before, and they could not help him.

Based on his investigation and after consultation with his superiors, Jacobson retained custody of Rasmussen and transported him to Douglas County Hospital for emergency admittance in accordance with § 83-1020 (Cum. Supp. 1988). That statute provides in part:

> Whenever any peace officer believes that any individual is a mentally ill dangerous person and that the harm described by section 83-1009 is likely to occur before mental health board proceedings under the Nebraska Mental Health Commitment Act may be invoked to obtain custody of the individual, such peace officer may immediately take such individual into custody, cause him or her to be taken into custody, or continue his or her custody if he or she is already in custody. . . . When a mental health center, a state hospital, or other government or private hospital has the capability to detain such an individual in the county in which the individual is found, the individual shall be placed in such facility.

Section 83-1009 (Reissue 1987) provides:

> Mentally ill dangerous person shall mean any mentally ill person, alcoholic person, or drug abusing person who presents:
>
> (1) A substantial risk of serious harm to another person or persons within the near future as manifested by evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm; or
>
> (2) A substantial risk of serious harm to himself or herself within the near future as manifested by evidence of

recent attempts at, or threats of, suicide or serious bodily harm or evidence of inability to provide for his or her basic human needs, including food, clothing, shelter, essential medical care, or personal safety.

The emergency admittance was granted, and Rasmussen does not challenge that admittance. At a subsequent involuntary civil commitment hearing before the Douglas County Mental Health Board on April 18, 1989, Rasmussen objected to the admission of Jacobson's testimony concerning the statements Rasmussen made to the officer while both were in Jacobson's cruiser. In his objection, Rasmussen claimed that due process and § 83-1059 (Reissue 1987) require that prior to their admission into evidence, an independent determination on the record must be made that any statements made to the police while a subject of a mental health commitment is in custody were made knowingly, intelligently, and voluntarily. Section 83-1059 provides that during a mental commitment hearing in no event shall evidence be considered which is inadmissible in criminal proceedings. The district court in Rasmussen's case found this court's holding in *Kraemer v. Mental Health Board of the State of Nebraska*, 199 Neb. 784, 261 N.W.2d 626 (1978), *cert. denied* 441 U.S. 960, 99 S. Ct. 2403, 60 L. Ed. 2d 1064 (1979), controlling and sufficient to answer Rasmussen's objection. We do not reach the issues raised in Rasmussen's objection because the ruling on it was not specifically assigned as error in this appeal, as required by § 25-1919. See, also, *Houska v. City of Wahoo*, 235 Neb. 635, 456 N.W.2d 750 (1990); Neb. Ct. R. of Prac. 9D(1)d (rev. 1989).

We do, however, review the record to determine if there was plain error in Rasmussen's involuntary commitment. There is substantial evidence in the record that at the time of his emergency admittance to a mental health facility Rasmussen was mentally ill and a danger to himself. Dr. Martin Weiler, Rasmussen's treating psychiatrist, testified before the Board that Rasmussen, at the time he was given emergency admittance, bordered on a delusional-type thinking, was psychotic, and, based upon reasonable medical certainty, was diagnosed as having a bipolar disorder for which he had been treated in two Iowa hospitals for about 4 months. Dr. Weiler

testified that Rasmussen had been discharged with medication from the Iowa hospitals, but had not been taking his medication. The psychiatrist said that for the most part, after Rasmussen's emergency admittance, his patient had been taking his medication, although there had been times when he refused it. At the time of the commitment hearing, Dr. Weiler testified that Rasmussen was no longer psychotic. When asked, "Do you have an opinion whether if the patient were to be released from the hospital today without further treatment whether he would be able to meet his own basic human needs for his own personal safety?" Dr. Weiler answered, "Well, right at present time I think he would be able to take care of his basic needs." The psychiatrist was not "100 percent sure" whether his patient would take his medication. Dr. Weiler testified that Rasmussen had not threatened anyone while he had been in the hospital between April 5 and April 18, the date of the hearing.

As a matter of law, the evidence does not clearly and convincingly support a finding that Rasmussen, at the time of his commitment hearing, presented a substantial risk of serious harm to another person or persons within the near future as manifested by evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm, as required for commitment under § 83-1009(1). His statement to Officer Jacobson that he was "programmed to kill" in the military falls far short of a threat to kill another.

Furthermore, there is no evidence in the record that Rasmussen, at the time of the mental health commitment hearing, posed a substantial risk of serious harm to himself within the near future as manifested by evidence of recent attempts at, or threats of, suicide or serious bodily harm, which is one of the prescriptions required under § 83-1009(2) to commit a person. Finally, the second prescription under § 83-1009(2) to commit a mentally ill person requires clear and convincing evidence that Rasmussen had an inability to provide for his basic human needs, including food, clothing, shelter, essential medical care, or personal safety. The district court was properly concerned with whether Rasmussen, upon release, would continue to take his prescribed medication. It is possible that if Rasmussen fails to take his medication he could pose a

substantial risk of serious harm to himself. However, the district court found only that the evidence *"indicates there is a strong possibility"* that Rasmussen will not continue to take his medication. An "indication of a strong possibility" does not, as a matter of law, support a finding that Rasmussen would not continue to take his medication. That being so, under the facts of this case, the evidence is not clear and convincing that Rasmussen, at the time of his commitment hearing, lacked the ability to provide for his basic human needs, including food, clothing, shelter, essential medical care, or personal safety, or that he posed a substantial risk of harm to himself.

We reverse the judgment of the district court and remand the cause with directions that Rasmussen's commitment to a mental health facility be vacated.

REVERSED AND REMANDED WITH DIRECTIONS
TO VACATE THE COMMITMENT.