In re Interest of Elizabeth I. Headrick, also known as Jeanette Kay Webb, alleged to be a mentally ill dangerous person.
Elizabeth I. Headrick, also known as Jeanette Kay Webb, appellant, v. Adams County Mental Health Board, appellee.

532 N.W.2d 643

Filed June 6, 1995.    No. A-94-745.

Arthur C. Toogood, Adams County Public Defender, for appellant.

Nathan B. Cox, Deputy Adams County Attorney, for appellee.

HANNON, IRWIN, and MUES, Judges.

MUES, Judge.

The Adams County Attorney's office filed a petition before the Adams County Mental Health Board (Board), alleging that Elizabeth I. Headrick, also known as Jeanette Kay Webb, was a mentally ill and dangerous person within the meaning of Neb. Rev. Stat. § 83-1009 (Reissue 1994). At a hearing held on April 1, 1993, the Board found that Webb was mentally ill and

"dangerous to herself" and ordered that she undergo inpatient alcohol treatment at the Hastings Regional Center. It was further ordered that "at such time as the Director of the inpatient treatment facility determines that inpatient treatment is no longer necessary, this commitment shall not terminate; rather, it shall continue on an outpatient basis . . . ." On April 28, 1993, Webb appealed the Board's decision to the district court for Adams County, but for reasons not apparent in the record a hearing was not held in the district court until 1 year later, on April 28, 1994. The district court affirmed the decision of the Board by its order of July 14, 1994. This appeal timely followed.

On appeal to this court, Webb asserts four assignments of error, but there is actually only one assignment, which we have restated: The district court erred by finding that the decision of the Board was supported by clear and convincing evidence.

The district court's review of an appeal from a mental health board is de novo on the record, and on further appeal, an appellate court will not interfere with a final order made by the district court unless the appellate court finds, as a matter of law, that the order is not supported by clear and convincing evidence. *In re Interest of Vance*, 242 Neb. 109, 493 N.W.2d 620 (1992). Before a person may be committed for treatment by a mental health board, it is necessary that the person be found to be mentally ill *and* that the person present a substantial risk of harm to others or to herself. § 83-1009. *In re Interest of Vance, supra.*

On March 31, 1993, the Adams County Attorney's office filed a petition alleging that Webb was a mentally ill and dangerous person. It should be noted that although the petition refers to the subject as "Elizabeth I. Headrick, a/k/a Jeanette Kay Webb," the subject's name is actually Jeanette Webb, and we shall refer to her by that name. A number of witnesses testified at the hearing before the Board on April 1, including Webb.

On March 29, Officers Mark Hinrichs and Brad Consbruck of the Hastings Police Department were directed to 738 North Burlington on a report of a breaking and entering at apartment No. 3. The officers detected no signs of forced entry at

apartment No. 3. Consbruck heard raised voices and what appeared to be an exchange of vulgarities coming from the apartment. He knocked on the door, and a woman wearing a nightgown, later identified as Webb, answered. There were two other women in the apartment besides Webb.

Consbruck attempted to speak to Webb, but she immediately became irate and upset at the fact that the officers were there. It appeared that apartment No. 3 was Webb's residence. Webb told Consbruck that her name was Elizabeth Headrick. Consbruck described Webb as having mood swings, alternating periods of calm with periods of being upset. When asked if she was going to hurt herself, Webb said it was none of their business. According to Consbruck, Webb demanded to know what the officers were doing there, and she continually asked Consbruck for his "license number and . . . name."

Hinrichs noticed that the other women in the apartment fit the descriptions of the suspects that were allegedly breaking into apartment No. 3. One of these women, later identified as Sydney Titman, spoke to Hinrichs. After conversing with Titman, Hinrichs talked with Webb. He disclosed the details of his conversation with Titman to Webb, and she became very angry. According to Hinrichs, Webb looked at Titman and stated that she was no longer a friend of Webb's. The record would allow the inference that these two women were acquaintances of Webb's who had entered her apartment because of concern for her. Little else about the background for the officers' visit can be garnered from the evidence, since neither of these two women was called to testify and the hearsay objection to the police officer's conversation with Titman was sustained.

Hinrichs testified that Webb "bolted off . . . towards Ms. Titman rather quickly"; that she kicked the officer who separated her from Titman; and that she then tried to head toward Titman, but was restrained. The officers detected a strong odor of an alcoholic beverage coming from Webb's person and breath.

Hinrichs placed Webb in protective custody because "[i]t was obvious that she was intoxicated and we felt that she would be a danger to herself or others by her actions and we felt that it was

— that she needed to be placed in emergency protective custody." When asked in what manner she was dangerous to herself, he responded, "By the attacks that she made [on] the officers and in attempting to attack the other, Ms. Sydney Titman, and statements that I had obtained during my investigation. . . ." Webb was taken to Mary Lanning Memorial Hospital and placed in emergency protective custody.

At the hospital, Webb kicked Hinrichs when he attempted to take her to a room. While at the hospital, Webb stated that she was an employee of the hospital, but then she denied being employed at the hospital. She did not indicate in what capacity she was employed at the hospital. The record reflects that Webb is a registered nurse and that she was employed at Mary Lanning Memorial Hospital.

Dr. Dorothy VanMetre, a clinical psychologist with Mary Lanning Memorial Hospital, testified at the hearing. Dr. VanMetre testified that she evaluates emergency protective custody cases. Dr. VanMetre interviewed Webb the day before the hearing. She did a series of tests on Webb such as the suicide probabilities scale, the Beck Depression Inventory, and the Minnesota Multiphasic Personality Inventory (MMPI). Dr. VanMetre testified that on the suicide probabilities scale, Webb had a low score on every part thereof; on the Beck Depression Inventory, Webb revealed only mild depression; and on Webb's MMPI, the scores for addiction, paranoia, and sociopathy were elevated. However, Webb's score for depression was not elevated on her MMPI.

Dr. VanMetre testified that Webb was not cooperative. When Dr. VanMetre asked about Webb's employment, she denied being a nurse and said that she was a waitress. Webb indicated that she had been in a treatment program previously, but she stated that she was not an alcoholic. Webb admitted that she had consumed some alcohol on March 29.

While she was at the hospital, the following medication was prescribed for Webb: Valium about every hour or two, a nicotine patch, sleeping pills, and Tylenol. Dr. VanMetre stated that Webb took seven or eight Valium tablets each 8-hour period, and it seemed to calm her down. Webb asked Dr. VanMetre about the dosage of Valium she was receiving, and

when Dr. VanMetre informed her of the dosage, she said, " 'That won't even do anything for me.' " Dr. VanMetre indicated that when a patient requires that much Valium to obtain the effects, it suggests that the patient has built up a tolerance for it.

It was Dr. VanMetre's opinion that Webb had an addiction to alcohol, that the pattern of dosages of Valium (the dosages recited above were interpreted by Dr. VanMetre from the hospital chart) would be consistent with addiction to Valium, and that "she's paranoid about a lot of things and sociopathic." Other than what can be inferred from Webb's behavior as detailed in the testimony, the record does not contain any evidence of how the paranoia and sociopathy, which Dr. VanMetre diagnosed, were manifested. Because of its importance to the resolution of this case, we quote at length from Dr. VanMetre's testimony on the ultimate issue of dangerousness, bearing in mind that the Board's finding was that Webb was dangerous to herself—there was no finding of danger to others.

Q- Based on the history, the studies, your own observations and interviews with her, do you have an opinion to a reasonable degree of professional psychological certainty as to the mental condition of the Subject, Elizabeth Ioni Headrick or Jeanette Kay Webb?

A- Well, I believe she is like what the MMPI showed. I think she does have an addiction to alcohol and I think she has a lot — she's paranoid about a lot of things and sociopathic.

Q- In your opinion, could these conditions present a substantial risk of harm to herself or other persons?

A- Yes, they could.

Q- And if a person were working as a registered nurse and suffering from these conditions, would that sufficiently impair her job performance and she might become a danger to patients in her care?

. . . .

A- Yes, I believe so.

Dr. VanMetre recommended that Webb be treated for her chemical dependency as an inpatient at the Hastings Regional

Center, saying that it was the least restrictive option available to treat her.

Webb testified at the hearing quite consistently with the testimony of the officers as to the events at her apartment. She testified that the two women entered her apartment that night by using a credit card, because they were allegedly concerned about her. Webb stated that she was surprised to see the women in her apartment, she became very angry when she saw them, and "there were words." She was also angry and confused when the police showed up. Webb also testified that she did not want to go to Mary Lanning Memorial Hospital because she was employed as a nurse there and this incident could "ruin" her, apparently because she was on a restricted license which prohibits her from consuming any alcohol. Webb admitted that she consumed several beers and a "drink" in her apartment that night. Webb indicated that she was in counseling at South Central Counseling for her alcohol problem, that she was currently in Alcoholics Anonymous, and that it was not her intention to go out and drink alcohol. Webb related that she had not consumed alcohol between June 5, 1991, and March 29, 1993.

Pursuant to § 83-1009, a mentally ill and dangerous person is one who presents

> (2) [a] substantial risk of serious harm to himself or herself within the near future as manifested by evidence of recent attempts at, or threats of, suicide or serious bodily harm or evidence of inability to provide for his or her basic human needs, including food, clothing, shelter, essential medical care, or personal safety.

When reviewing a decision from a mental health commitment hearing, the focus must be on the subject's condition at the time of hearing, not when the subject of the commitment hearing was initially taken into custody. *In re Interest of Rasmussen*, 236 Neb. 572, 462 N.W.2d 621 (1990). Actions and statements of a person alleged to be mentally ill and dangerous which occur prior to the hearing are probative of the subject's present mental condition, but in order for a past act to have any evidentiary value, it must form some foundation for a prediction of future dangerousness and be,

therefore, probative of that issue. *Id*.

■ As we earlier recited, the standard for a civil commitment of a mentally ill and dangerous person is by "clear and convincing evidence." Clear and convincing evidence means the amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proven and, further, that it is more than a preponderance of evidence, but less than proof beyond a reasonable doubt. *Davis v. Wright*, 243 Neb. 931, 503 N.W.2d 814 (1993). It is well established that the mere recitation of past acts, in the absence of a showing that such clearly form the foundation for a prediction of future dangerousness, cannot serve as the basis for a finding that one is a mentally ill and dangerous person. See *State v. Hayden*, 233 Neb. 211, 444 N.W.2d 317 (1989). See, also, *In re Interest of Blythman*, 208 Neb. 51, 302 N.W.2d 666 (1981); *Matter of Lucas*, 31 Or. App. 947, 571 P.2d 1275 (1977).

The record from the hearing in this case consists of only 53 pages of testimony and no exhibits. It is true that there is evidence of Webb's aberrant and antisocial behavior on March 29, 1993, including uncontrolled anger, kicking at people, attempting to bite the officers, and attempting to conceal her true identity. However, standing alone, such conduct does not provide the foundation for a prediction of Webb's future dangerousness to herself. The prediction of future dangerousness is the fundamental *predicate* for a deprivation of liberty by an involuntary commitment. This is true even if the subject's behavior is angry, strange, drunken, or uncooperative. There still must be evidence to support a prediction of future dangerousness, notwithstanding the recitation of Webb's behavior exhibited on March 29.

■ Neb. Rev. Stat. § 83-1059 (Reissue 1994) makes the general rules of evidence applicable in civil proceedings also applicable in all hearings held under the Nebraska Mental Health Commitment Act. Importantly, to support commitment in civil mental health commitment proceedings, when a medical professional testifies, he or she must testify that the subject is both mentally ill and a danger to himself or others to *a reasonable degree of medical certainty. In re Interest of Tweedy*, 241 Neb. 348, 488 N.W.2d 528 (1992). *In re Interest of*

*Tweedy* involved the attempted mental health commitment of a pedophile, which revolved around the issue of whether he would reoffend. The Supreme Court reversed the district court after quoting extensively from a psychologist's testimony and then summarizing as follows: "Dr. Bohn would not testify to a reasonable degree of medical or psychological certainty that there was a substantial likelihood Tweedy would recidivate." *Id.* at 354, 488 N.W.2d at 532. Although the court acknowledged that Tweedy admitted to a lingering attraction toward young boys, it stated that a "residual attraction does not, in and of itself, translate into guaranteed recidivism. We cannot infer that activity when the expert witness will not testify, to a reasonable degree of certainty, to an opinion as to the offender's dangerousness." *Id.* at 354, 488 N.W.2d at 532-33. The Supreme Court has said that the actual assessment of the likelihood of danger calls for an exercise of medical judgment, but the sufficiency of the evidence to support such a determination is fundamentally a legal question. See *In re Interest of Blythman, supra.*

The problem in the instant case is the same as was present in *In re Interest of Tweedy*—the necessary medical testimony is not present. On the question of whether the conditions she diagnosed in Webb, i.e., chemical dependency, paranoia, and sociopathy, presented a substantial risk of harm to Webb or others, Dr. VanMetre testified that "they could." With respect to whether these conditions would impair Webb's job performance and whether she "might become a danger to patients in her care," Dr. VanMetre answered affirmatively. The words "could" and "might" lack certainty and connote only that such things may happen or are possible. Thus, as a matter of law, the opinions of Dr. VanMetre lack psychological certainty, which is the evidential cornerstone for the deprivation of freedom under the Nebraska Mental Health Commitment Act.

Psychological evidence based on possibility is no less speculative and conjectural than like testimony by other experts. Just as medical opinions are to be based on reasonable medical certainty, see *Caradori v. Frontier Airlines*, 213 Neb. 513, 329 N.W.2d 865 (1983), so must psychological opinions be

based on reasonable psychological certainty. *In re Interest of D.L.S.*, 230 Neb. 435, 432 N.W.2d 31 (1988). In *Caradori, supra*, the court found that a doctor's opinion in a worker's compensation case that the disability "could" have been caused by the accident was insufficient to carry the worker's burden of proof of a causal connection between the injury, the employment, and the disability. Webb's liberty is at stake. Therefore, Dr. VanMetre's opinion on the key issue of dangerousness, stated as "could" be, is no less deficient than the doctor's opinion in *Caradori*. Furthermore, there was no evidence of any threatened harm by Webb to herself, and the testing for suicide revealed a low risk.

Thus, although Webb may well be troubled and even mentally ill, there was no clear and convincing evidence to justify the Board's conclusion that Webb represented a substantial risk of serious harm to herself in the near future as required by § 83-1009. To deprive Webb of her liberty on the meager evidence presented at this hearing is a travesty. The order of the district court upholding the Board's commitment is reversed, and the order of commitment is vacated.

REVERSED AND VACATED.