781 N.W.2d 438 (2010)
279 Neb. 708
In re Interest of G.H., alleged to be a dangerous sex offender.
G.H., appellant,
v.
Mental Health Board of the Fourth Judicial District, appellee.
No. S-09-530.
Supreme Court of Nebraska.
April 16, 2010.
*439 Thomas C. Riley, Douglas County Public Defender, and Zoë R. Wade for appellant.
Jeffrey J. Lux, Deputy Douglas County Attorney, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
STEPHAN, J.
G.H. was convicted in 2002 of one count of sexual assault on a child and one count of attempted first degree sexual assault. He was sentenced to 3 to 5 years' imprisonment on the first count and to 10 to 15 years' imprisonment on the second count, the sentences to run concurrently. In May 2008, a petition was filed pursuant to Nebraska's Sex Offender Commitment Act (SOCA),[1] alleging that G.H. was a dangerous sex offender. After conducting an evidentiary hearing, the Mental Health Board of the Fourth Judicial District (the Board) found G.H. to be a dangerous sex offender and ordered his continued confinement for inpatient sex offender treatment. The district court affirmed, and G.H. appeals.

I. FACTS
G.H.'s 2002 crimes were perpetrated on his 9-year-old niece and his 42-year-old sister. On May 30, 2008, while G.H. was *440 still incarcerated for these offenses, the Douglas County Attorney filed a petition alleging that G.H. was a dangerous sex offender within the meaning of SOCA. The matter came on for hearing before the Board on June 12.
Mark E. Lukin, Ph.D., was the only witness who testified at the hearing. Lukin is a licensed psychologist employed by the Nebraska Department of Correctional Services as a clinical psychologist. At the time of his testimony, Lukin was in charge of the inpatient mental health unit at the Lincoln Correctional Center. His duties included supervising and conducting evaluations of sex offenders.
Lukin evaluated G.H. in February 2008. The evaluation consisted of a mental status examination; a review of G.H.'s prior sex offender evaluations and his prior sex offender treatment; a review of G.H.'s corrections file and presentence investigation report; a clinical interview; and the administration and interpretation of several risk assessment instruments, including the "STATIC-99," the "Stable 2000," and the "SORAG." On the STATIC-99, G.H. scored a 6 on a scale of 0 to 12. Lukin testified that this score placed G.H. in the high-risk category for committing a future sexual offense. According to the STATIC-99 manual, a person with a score of 6 has a 39-percent chance of sexually reoffending within 5 years and a 52-percent chance of sexually reoffending within 15 years. On the Stable 2000 test, G.H. received a score of 10, which Lukin interpreted as indicating "broad problems in [his] ability to manage [his] future reoffense risk." On the SORAG, G.H. was determined to have a 58-percent chance to sexually reoffend within 7 years and a 66-percent chance to sexually reoffend within 10 years.
Based on all of the information obtained during his evaluation of G.H., Lukin arrived at a three-part diagnosis with a reasonable degree of psychological certainty: (1) alcohol dependence, in remission due to the controlled prison environment; (2) a cognitive disorder; and (3) an antisocial personality disorder with dependent features. Lukin testified that the alcohol dependence and cognitive disorder were "Axis I" mental disorders as defined by the American Psychiatric Association's "Diagnostic and Statistical Manual"[2] (which we will refer to as the "DSM-IV-TR") and that the antisocial personality disorder was considered an "Axis II" disorder as defined by the DSM-IV-TR. Lukin opined that the alcohol dependence was a "primary concern" as to whether G.H. was likely to reoffend sexually and that while the cognitive disorder did not contribute to the risk of reoffense, it was a treatment interference factor that limited G.H.'s ability to benefit from treatment. Lukin opined that the antisocial personality disorder was also a primary factor in assessing the risk of reoffense. Lukin testified that because of the disorders he diagnosed, G.H. would "present an ongoing risk" of danger to himself or others. Lukin also testified that because of the disorders, there was an increased risk that G.H. would engage in repeat acts of violence, and that G.H. was substantially unable to control his behavior regarding sexual offenses. Lukin testified that upon release from incarceration, G.H. would be at "high risk to sexually and/or violently reoffend compared to other individuals who have already committed sexual or violent crimes." Lukin testified that G.H. would *441 benefit from treatment, and although Lukin had not prepared a specific treatment plan for G.H. at the time of his testimony, it was Lukin's opinion based upon the actuarial risk and other information he reviewed that "the highest available level of care" would be appropriate for G.H.
After considering all the evidence, the Board found by clear and convincing evidence that G.H. was a dangerous sex offender and that inpatient treatment was the least restrictive available therapy for him. The Board determined on the basis of Lukin's testimony that G.H. "demonstrates a constellation of mental illness," including alcohol addiction, antisocial personality disorder, and cognitive impairment that "would make him more likely to engage in repeat acts of sexual violence." The Board ordered G.H. placed in the custody of the Nebraska Department of Health and Human Services for inpatient sexual offender treatment.
G.H. filed a petition in error in the district court for Douglas County seeking review and reversal of the commitment order on several grounds. The district court overruled the petition in error and affirmed the commitment order. G.H. then perfected this timely appeal from the order of the district court.

II. ASSIGNMENTS OF ERROR
G.H. assigns, restated and renumbered, that the district court erred in finding clear and convincing evidence that he was a dangerous sex offender because (1) the evidence does not support a finding that G.H. suffers from an antisocial personality disorder or that an antisocial personality disorder makes G.H. dangerous; (2) the court erroneously considered Lukin's diagnosis of alcohol dependence as a mental illness which could subject G.H. to commitment; (3) the evidence does not support a finding that G.H. suffered from alcohol dependence at the time of the hearing or that alcohol dependence makes G.H. dangerous; (4) the evidence does not support a finding that G.H. suffers from a cognitive disorder or that a cognitive disorder makes G.H. dangerous; (5) the actuarial instruments employed during G.H.'s assessment do not provide a sufficient basis for Lukin's opinion; (6) Lukin's opinion of dangerousness, expressed entirely in terms of risk, is insufficient to support a finding that G.H. is a dangerous sex offender; and (7) there was insufficient evidence that the proposed treatment plan was the least restrictive alternative.

III. STANDARD OF REVIEW
The district court reviews the determination of a mental health board de novo on the record.[3] In reviewing a district court's judgment upon review of a mental health board determination, an appellate court will affirm the judgment unless it finds, as a matter of law, that the judgment is not supported by clear and convincing evidence.[4]

IV. ANALYSIS
Nebraska has two statutory methods by which individuals who pose a risk to society due to a mental disorder may be subjected to involuntary custody and treatment. The Nebraska Mental Health Commitment Act (MHCA)[5] applies to any *442 person who is mentally ill and dangerous.[6] SOCA applies specifically to convicted sex offenders who have completed their jail sentences but continue to pose a threat of harm to others.[7] In order to subject a person to involuntary confinement for purposes of treatment under SOCA, the State has the burden to prove by clear and convincing evidence that "(a) the subject is a dangerous sex offender and (b) neither voluntary hospitalization nor other treatment alternatives less restrictive of the subject's liberty than inpatient or outpatient treatment ordered by the mental health board are available or would suffice to prevent the harm."[8]
Section 71-1203(1) of SOCA incorporates Neb.Rev.Stat. § 83-174.01(1) (Reissue 2008), which defines the term "[d]angerous sex offender" as
(a) a person who suffers from a mental illness which makes the person likely to engage in repeat acts of sexual violence, who has been convicted of one or more sex offenses, and who is substantially unable to control his or her criminal behavior or (b) a person with a personality disorder which makes the person likely to engage in repeat acts of sexual violence, who has been convicted of two or more sex offenses, and who is substantially unable to control his or her criminal behavior.

1. DANGEROUS SEX OFFENDER

(a) Personality Disorder
Lukin testified with reasonable psychological certainty that G.H. had an antisocial personality disorder with dependent features. Lukin reached this diagnosis on the basis of G.H.'s "long-standing pattern of repeated and varied offenses." There is no evidence disputing this diagnosis. G.H. argues that it is entitled to no weight because Lukin testified that the personality disorder "might reduce [G.H.'s] likelihood of caring or being motivated to avoid reoffense and subsequent consequence for those crimes." But this isolated statement focuses on the personality disorder alone, not the combined effect of the personality disorder and other diagnoses, which we discuss below. We conclude that the evidence establishes the diagnosis of antisocial personality disorder and that it was properly considered by the district court.

(b) Alcohol Dependence
G.H. contends that alcohol dependence cannot be considered a "mental illness" for purposes of SOCA, based upon definitional differences between SOCA and MHCA. SOCA incorporates by reference[9] the definition of "mentally ill" found in MHCA:
Mentally ill means having a psychiatric disorder that involves a severe or substantial impairment of a person's thought processes, sensory input, mood balance, memory, or ability to reason which substantially interferes with such person's ability to meet the ordinary demands of living or interferes with the safety or well-being of others.[10]
But SOCA does not incorporate MHCA's definition of "substance dependent," which means

*443 having a behavioral disorder that involves a maladaptive pattern of repeated use of controlled substances, illegal drugs, or alcohol, usually resulting in increased tolerance, withdrawal, and compulsive using behavior and including a cluster of cognitive, behavioral, and physiological symptoms involving the continued use of such substances despite significant adverse effects resulting from such use.[11]
Nor does SOCA include its own definition of "substance dependent." Under MHCA, a person may be adjudicated as a "[m]entally ill and dangerous person" and subjected to involuntary custody and treatment on the basis of either mental illness or substance dependence.[12] G.H. argues that because SOCA does not incorporate the language of MHCA with respect to substance dependence, substance dependence cannot be considered a mental illness for purposes of determining that an individual is a dangerous sex offender.
Lukin testified that alcohol dependence is an Axis I mental disorder as defined by the DSM-IV-TR, and he considered the alcohol dependence and antisocial personality disorder as primary factors in assessing the risk that G.H. would reoffend sexually. Lukin testified: "I did not [diagnose G.H.] with a paraphiliac condition simply because it's the prominence of his substance dependence and antisocial personality. He would be characterized more as an opportunistic sex offender and someone with general antisocial personality independent rather than a primary paraphiliac or patterned sex offender."
We note that because G.H. had been convicted of two sex offenses, he could be adjudicated as a dangerous sex offender on the basis of the personality disorder alone under the alternative definition of § 83-174.01(1)(b). On these facts, we conclude that the diagnosis of alcohol dependence was properly considered in conjunction with the diagnosis of an antisocial personality disorder in the calculus of whether G.H. was a dangerous sex offender within the meaning of SOCA.
We are not persuaded by G.H.'s argument that the diagnosis of alcohol dependence should be disregarded because Lukin described it as "in remission." Lukin attributed this fact to the "controlled environment" created by G.H.'s incarceration, but testified that G.H. nevertheless displayed signs consistent with alcohol dependence.

(c) Cognitive Disorder
G.H. argues that Lukin's diagnosis of a cognitive disorder was an insufficient basis upon which to conclude that he was a dangerous sex offender. Lukin explained that this diagnosis "is really an acknowledgement that there are some impairments in [G.H.'s] cognition without being able to fully assess the etiology or the causal factors." Lukin regarded this as a "relatively minor factor" in assessing the risk of reoffense, but he testified that it would "delimit or may constrain [G.H.'s] ability to gain the full amount of treatment that he might otherwise have if he did not have the condition." It is clear that Lukin did not base his opinion that G.H. was a dangerous sex offender solely or primarily on his cognitive disorder diagnosis, but merely considered the diagnosis with other factors. As such, the diagnosis was properly considered by the Board and the district court. The district court specifically noted the limitations on the significance of this diagnosis to which Lukin testified.

*444 (d) Danger of Reoffense
To establish that G.H. was a dangerous sex offender under SOCA, the State was required to prove by clear and convincing evidence that he is likely to engage in repeat acts of sexual violence and that he is substantially unable to control his criminal behavior.[13] In this context, "[l]ikely to engage in repeat acts of sexual violence means the person's propensity to commit sex offenses resulting in serious harm to others is of such a degree as to pose a menace to the health and safety of the public."[14] Similarly, "[s]ubstantially unable to control ... criminal behavior means having serious difficulty in controlling or resisting the desire or urge to commit sex offenses."[15]
G.H. argues that the results of the actuarial risk assessment instruments do not provide a sufficient basis for Lukin's opinion that G.H. would pose a danger if released without treatment. G.H. contends that the results measure actuarial chance but provide no insight on the specific question of whether he would reoffend if released without treatment. But as G.H. acknowledges in his brief, Lukin did not rely exclusively on the results of the STATIC-99, Stable 2000, and SORAG assessments in forming his opinions. Lukin also considered the history he obtained from G.H. and the clinical interview he conducted. Lukin testified that the risk assessment instruments were peer reviewed and generally accepted in the field of psychology as a means of assessing the risk that a convicted sex offender will reoffend.
We have noted in a different but related context that the nonexistence of an instrument which will perfectly predict future conduct does not preclude the use of rationally based instruments developed and validated by mental health professionals.[16] In a recent SOCA case,[17] we concluded that a psychologist's evaluation which included STATIC-99 and SORAG scores was sufficient and probative of the fact that a sex offender remained a danger to society. Although, in the instant case, the Stable 2000 and SORAG instruments were administered several months before the hearing, there is no indication in the record that this affected the validity of the results as a means of assessing the risk of recidivism at the time of the hearing. We are satisfied that there was adequate foundation for the actuarial risk assessment scores and conclude that they were properly considered by the Board and the district court as part of the basis for Lukin's opinions.
G.H. also argues that Lukin's opinion of dangerousness, expressed entirely in terms of risk, is insufficient to support a finding that G.H. is a dangerous sex offender. G.H. contends that Lukin's opinions establish nothing more than an increased risk or possibility that he will reoffend without treatment. According to G.H., this is insufficient under cases holding that in order to support civil commitment in civil mental health proceedings, a medical expert must establish that the subject poses a danger to others to a reasonable degree of medical certainty.[18]
*445 This is the same standard that we require for expert medical opinion to establish causation under tort law. In that context, we have held that although expert medical testimony need not be couched in the magic words "reasonable medical certainty" or "reasonable probability," it must be sufficient as examined in its entirety to establish the crucial causal link between the plaintiff's injuries and the defendant's negligence.[19] Medical expert testimony regarding causation based upon possibility or speculation is insufficient; it must be stated as being at least "probable," in other words, more likely than not.[20] Applying the same principle here, the question is whether Lukin established a probability that G.H. would commit repeat acts of sexual violence.
Lukin testified that in his professional opinion, G.H. fell within the statistical range of sexual and violent reoffense predicted by his SORAG scores, i.e., a 58-percent chance of sexual or violent reoffense, or both, within 7 years and a 76-percent chance of sexual or violent reoffense, or both, within 10 years. Asked if the conditions he diagnosed made G.H. "likely to engage in repeat acts of violence," Lukin testified, "Yes. It increases his risk." Lukin further testified that G.H. attributed his commission of sex offenses to alcohol, but that to Lukin's knowledge, G.H. had never undergone inpatient alcohol treatment. Based upon his clinical interview and review of records and actuarial risk assessments, Lukin opined that G.H. would be "at high risk to sexually and/or violently reoffend compared to other individuals who have already committed sexual or violent crimes." Lukin further testified that due to the diagnosed mental and personality disorders, G.H. was substantially unable to control his behavior with regard to sexual offenses. We conclude that this testimony, viewed in its entirety, was sufficient as a matter of law to support the findings of the Board and the district court that G.H. was a dangerous sex offender for purposes of SOCA.

2. LEAST RESTRICTIVE TREATMENT ALTERNATIVE
In addition to establishing that G.H. was a dangerous sex offender, the State also had the burden of proving by clear and convincing evidence that neither voluntary hospitalization nor other alternative treatment less restrictive than inpatient treatment would prevent him from harming himself or others.[21] Lukin testified that while he had not prepared a specific treatment plan for G.H., it was his opinion that due to G.H.'s relatively high risk of recidivism and the fact that G.H. had limited experience with independent living during the past 20 years due to his incarceration, G.H. would require the "highest available level of care," and that an inpatient treatment program would be the appropriate and least restrictive treatment alternative for him. In response to a question from a member of the Board regarding an appropriate treatment plan for G.H., Lukin testified:
[M]y professional judgment would be that what would be best for [G.H.] would also be best for the community, and that is a residential or secure setting to continue the efforts that he started already, *446 and to over a period of time step him down.
And rather than releasing him directly to an environment where he's had very little success, living independently in the community, it would allow him a step toward greater approach so that his skills increase both in managing his sexual urges and his sobriety.
We conclude that Lukin's testimony was sufficient as a matter of law to meet the State's burden of justifying civil commitment of a dangerous sex offender under SOCA.

V. CONCLUSION
For the reasons discussed, we conclude as a matter of law that the judgment of the district court affirming the findings of the Board is supported by clear and convincing evidence, and we affirm.
AFFIRMED.
NOTES
[1] Neb.Rev.Stat. §§ 71-1201 to 71-1226 (Reissue 2009).
[2] See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed. text rev. 2000).
[3] In re Interest of D.V., 277 Neb. 586, 763 N.W.2d 717 (2009); In re Interest of J.R., 277 Neb. 362, 762 N.W.2d 305 (2009), cert. denied ___ U.S. ___, 130 S.Ct. 148, 175 L.Ed.2d 96.
[4] See In re Interest of J.R., supra note 3.
[5] Neb.Rev.Stat. §§ 71-901 to 71-962 (Reissue 2009).
[6] § 71-902; In re Interest of O.S., 277 Neb. 577, 763 N.W.2d 723 (2009), cert. denied ___ U.S. ___, 130 S.Ct. 148, 175 L.Ed.2d 96.
[7] § 71-1202; In re Interest of O.S., supra note 6.
[8] § 71-1209(1). See In re Interest of D.V., supra note 3.
[9] §§ 71-1203(1) and 83-174.01(3).
[10] § 71-907.
[11] § 71-913.
[12] See § 71-908.
[13] See §§ 71-1203(1), 71-1209(1), and 83-174.01(1). See, also, In re Interest of O.S., supra note 6.
[14] §§ 71-1203(1) and 83-174.01(2).
[15] §§ 71-1203(1) and 83-174.01(6).
[16] Slansky v. Nebraska State Patrol, 268 Neb. 360, 685 N.W.2d 335 (2004).
[17] In re Interest of O.S., supra note 6.
[18] See, In re Interest of Tweedy, 241 Neb. 348, 488 N.W.2d 528 (1992); In re Interest of Rasmussen, 236 Neb. 572, 462 N.W.2d 621 (1990); In re Interest of Headrick, 3 Neb.App. 807, 532 N.W.2d 643 (1995).
[19] Fackler v. Genetzky, 263 Neb. 68, 638 N.W.2d 521 (2002); Doe v. Zedek, 255 Neb. 963, 587 N.W.2d 885 (1999).
[20] Id.
[21] See, § 71-1209(1)(b); In re Interest of O.S., supra note 6.