IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF J.C.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF J.C., ALLEGED TO BE A MENTALLY ILL AND DANGEROUS PERSON.

J.C., APPELLANT,

V.

MENTAL HEALTH BOARD OF THE FIFTH JUDICIAL DISTRICT, APPELLEE.

Filed April 25, 2017.    No. A-16-841.

Appeal from the District Court for Platte County: ROBERT R. STEINKE, Judge. Affirmed.

Timothy P. Matas, Platte County Public Defender, for appellant.

Elizabeth J.E. Lay, Deputy Platte County Attorney, for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

INTRODUCTION

The Mental Health Board of the Fifth Judicial District, sitting in Platte County, Nebraska (Board), determined that J.C. is a mentally ill and dangerous person under the Nebraska Mental Health Commitment Act (Commitment Act), Neb. Rev. Stat. § 71-901 et seq. (Reissue 2009 & Cum. Supp. 2016). The Board ordered J.C. committed to the Nebraska Department of Health and Human Services with placement in an outpatient nonresidential treatment facility. The district court for Platte County affirmed the Board's decision. J.C. argues on appeal that there was not clear and convincing evidence presented that he was mentally ill and dangerous at the time of his hearing before the Board. We affirm.

- 1 -

BACKGROUND

On April 20, 2016, Officer Brian Hunke of the Columbus Police Department responded to an emergency call that an unknown man had cut his wrists and threatened to set himself on fire. When Hunke arrived at the home, he found J.C. slumped over a work bench in a detached garage. J.C. was covered in blood and a large pocket knife was nearby. Hunke grabbed the knife and then noticed two large cuts on J.C.'s left wrist. Hunke asked J.C. what had happened and J.C. said he cut his wrists because his girlfriend had been unfaithful and left him. But J.C. never told Hunke that he intended to commit suicide. J.C. was taken by ambulance to Columbus Community Hospital for medical treatment.

The next day, J.C. was transferred to Richard Young Hospital in Kearney, Nebraska, and placed under emergency protective custody. Jessica Sawyer, an "APRN," completed a form titled "36 Hour Determination for EPC Patients." On that form, she concluded that J.C. was a mentally ill and dangerous person that presented a risk of harm to himself and others, and she recommended commitment to inpatient treatment. J.C. remained at Richard Young Hospital until his hearing before the Board.

On April 22, 2016, the Platte County Attorney filed a petition pursuant to the Commitment Act, claiming that J.C. was a mentally ill and dangerous person and that "neither voluntary hospitalization nor other treatment alternatives less restrictive of [J.C.'s] liberty than a Mental Health Board-ordered treatment disposition are available or would suffice to prevent" a substantial risk of harm to himself or others.

The Board held a hearing on April 27, 2016. Both Hunke and Sawyer testified. Hunke described his interaction with J.C. when he responded to the call on April 20, as set forth above. Sawyer testified that she is a licensed psychiatric nurse practitioner and that she has, in the past, given opinions regarding mental illness, dangerousness, and least restrictive treatment options. She explained that she diagnosed J.C. with an adjustment disorder with depressed mood and alcohol induced depressive disorder, and nicotine disorder. Sawyer informed the Board that at the time of his admission, J.C. was mentally ill and dangerous; he had admitted to her that he was feeling overwhelmed and had slit his wrists. Additionally, Sawyer testified about J.C. having a blood alcohol content of .242 at the time of the incident. She also testified that on the morning of the hearing, prior to leaving the hospital, J.C. admitted to still feeling significantly overwhelmed at being discharged from the hospital and getting "his life back on track." Sawyer opined that outpatient medication management and outpatient therapy were the least restrictive treatment options.

In its order filed on April 27, 2016, the Board determined that J.C. is mentally ill and dangerous and ordered outpatient dual-diagnoses treatment. J.C. appealed the Board's decision to the district court where J.C. argued that there was not sufficient evidence presented that he was mentally ill and dangerous at the time of his hearing. J.C. claimed that his past actions did not hold sufficient probative value of future harm to justify the Board's determination. The district court affirmed the decision of the Board in its order entered August 3, 2016, holding that the "April 20, 2016, attempt at suicide was, given the facts surrounding this case, probative of [J.C.'s] mental condition existing at the time of the Board's hearing, and provided a foundation for a prediction

of future dangerousness supportive of the Board's decision that he was a mentally ill and dangerous person." J.C. timely appealed the district court's order.

## ASSIGNMENT OF ERROR

Summarized and restated, J.C. assigns that the district court erred in concluding that he was a mentally ill and dangerous person at the time of his hearing before the Board.

## STANDARD OF REVIEW

The district court reviews the determination of the mental health board de novo on the record. *In re Interest of Kochner*, 266 Neb. 114, 662 N.W.2d 195 (2003). In reviewing a district court's judgment under the Commitment Act, appellate courts will affirm the district court's judgment unless, as a matter of law, the judgment is unsupported by evidence which is clear and convincing. *Id.*

Clear and convincing evidence is that amount of evidence which produces in the trier of fact a firm belief or conviction about the existence of a fact to be proved. *Castellano v. Bitkower*, 216 Neb. 806, 346 N.W.2d 249 (1984). Clear and convincing evidence has been held to mean more than a preponderance of evidence but less than evidence beyond a reasonable doubt. *Id.*

## ANALYSIS

*Standard for Mentally Ill and Dangerous Determination.*

The purpose of the Commitment Act "is to provide for the treatment of persons who are mentally ill and dangerous." § 71-902. Persons are encouraged to obtain voluntary treatment, but if not obtained, they may be subject to involuntary custody. See *id.* The Commitment Act sets forth the following definition:

> Mentally ill and dangerous person means a person who is mentally ill or substance dependent and because of such mental illness or substance dependence presents:
>
> (1) A substantial risk of serious harm to another person or persons within the near future as manifested by evidence of recent violent acts or threats of violence or by placing others in reasonable fear of such harm; or
>
> (2) A substantial risk of serious harm to himself or herself within the near future as manifested by evidence of recent attempts at, or threats of, suicide or serious bodily harm or evidence of inability to provide for his or her basic human needs, including food, clothing, shelter, essential medical care, or personal safety.

§ 71-908.

Pertinent to this case, § 71-908(2) guides our review of the record for clear and convincing evidence of a substantial risk of serious harm to J.C. in "the near future as manifested by evidence of recent attempts at, or threats of, suicide or serious bodily harm[.]" J.C. does not challenge any determination that he has a mental illness, nor does he challenge that he was mentally ill and dangerous at the time of admission on April 20, 2016. Rather, he argues that the evidence failed to prove that J.C. was mentally ill and dangerous at the time of the hearing on April 27. Additionally, J.C. argues that "the likelihood of future danger is a medical judgment, and no such

testimony was offered at [the] hearing and therefor[e] a commitment was improper." Brief for appellant at 10.

"'To confine a citizen against his will because he is likely to be dangerous in the future, it must be shown that he has actually been dangerous in the recent past and that such danger was manifested by an overt act, attempt or threat to do substantial harm to himself or to another.'" *In re Interests of Blythman*, 208 Neb. 51, 57, 302 N.W.2d 666, 671 (1981) (quoting *Lynch v. Baxley*, 386 F. Supp. 378, 391 (M.D. Ala. 1974)). There is no question that J.C.'s actions on April 20, 2016, were overt and dangerous, caused substantial harm to himself, and were relevant to assessing his mental condition at the time of his Board hearing. Actions and statements of a person alleged to be mentally ill and dangerous which occur prior to the hearing are probative of the subject's present mental condition. *In re Interest of Rasmussen*, 236 Neb. 572, 462 N.W.2d 621 (1990). However, in order for a past act to have any evidentiary value, it must form some foundation for a prediction of future dangerousness and be, therefore, probative of that issue. *Id.* While the actual assessment of the likelihood of danger calls for an exercise of medical judgment, the sufficiency of the evidence to support such a determination is fundamentally a legal question. *Blythman*, *supra*.

Further, in reviewing a decision from a mental health commitment hearing, a court should remember that in determining whether a person is dangerous, the focus must be on the subject's condition at the time of the hearing, not the date the subject of the commitment hearing was initially taken into custody. *Rasmussen, supra*.

*Evidence Presented and Future Probative Value.*

J.C.'s arguments revolve around the lack of probative value of his past acts. J.C. cites *In re Interest of Headrick*, 3 Neb. App. 807, 814, 532 N.W.2d 643, 648 (1995), for the proposition that "[i]t is well established that the mere recitation of past acts, in the absence of a showing that such clearly form the foundation for a prediction of future dangerousness, cannot serve as the basis for a finding that one is a mentally ill and dangerous person." He believes that "no medical testimony was offered concerning the future or current medical condition of [J.C.] at the time of the hearing," and "[i]n the absence of such testimony, the mere recitation of past acts, by itself, cannot be considered for civil commitment." Brief for appellant at 11.

It is true that Sawyer testified only that J.C. was mentally ill and dangerous at the time of his admission; Sawyer did not speak to whether or not J.C. was mentally ill and dangerous at the time of the hearing. Therefore, as noted by the district court, given this record, the issue "is whether [J.C.'s] past attempt at suicide was sufficiently probative of his future dangerousness to support the Board's order of outpatient commitment." The district court concluded that J.C.'s "April 20, 2016, attempt at suicide was, given the facts surrounding this case, probative of his mental condition existing at the time of the Board's hearing, and provided a foundation for a prediction of future dangerousness supportive of the Board's decision that [J.C.] was a mentally ill and dangerous person." The court further concluded that "neither voluntary hospitalization nor other treatment alternatives less restrictive of [J.C.'s] liberty than outpatient treatment as ordered by the Board were available or would suffice to prevent the harm described in § 71-908."

In determining whether an act is sufficiently recent to be probative on the issue of dangerousness, each case must be decided on the basis of the surrounding facts and circumstances.

*Kochner, supra*. Any act that is used as evidence of dangerousness must be sufficiently probative to predict future behavior and the subject's present state of dangerousness. *Blythman, supra*. We note that in *Blythman, supra,* even acts which occurred 5 years prior to the mental health board hearing in that case were not too remote to be probative of the subject's present state of dangerousness and probable future conduct, nor did proof of such acts contravene the subject's due process and equal protection guarantees because there was sufficient evidence that such acts were still probative of the subject's present state of dangerousness.

In the instant case, we are asked to consider whether there is clear and convincing evidence of a substantial risk of serious future harm to J.C. based on evidence of his recent attempt at suicide or serious bodily harm. We agree with the district court that the evidence clearly and convincingly supports such a conclusion. Just 7 days prior to the Board hearing, Hunke found J.C. slumped over a work bench, his left wrist cut open, and covered in his own blood. J.C. had a blood alcohol content of .242 and he also threatened to light himself on fire. At the hospital, Sawyer diagnosed J.C. with adjustment disorder with depressed mood and alcohol induced depressive disorder, and nicotine disorder. She concluded that J.C. was mentally ill and dangerous; J.C. admitted to Sawyer that he was feeling overwhelmed and had slit his wrists. Importantly, Sawyer also testified that on the morning of the hearing, prior to leaving the hospital, J.C. admitted to still feeling significantly overwhelmed at being discharged from the hospital and getting "his life back on track." J.C.'s actions and statements occurring in the week prior to, and the day of, the Board hearing were sufficiently probative to predict future behavior and J.C.'s present state of dangerousness.

## CONCLUSION

We affirm the decision of the district court, which affirmed the Board's determination.

AFFIRMED.