Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
04/11/2017 08:19 AM CDT

In re Interest of K.W., alleged to be
a dangerous sex offender.
K.W., appellant, v. Mental Health Board
of the Fourth Judicial District and
State of Nebraska, appellees.

___ N.W.2d ___

Filed April 11, 2017.    No. A-16-684.

1. **Mental Health: Appeal and Error.** The district court reviews the determination of a mental health board de novo on the record.
2. **Judgments: Convicted Sex Offender: Appeal and Error.** In reviewing a district court's judgment under the Sex Offender Commitment Act, an appellate court will affirm unless it finds, as a matter of law, that clear and convincing evidence does not support the judgment.
3. **Mental Health: Convicted Sex Offender: Words and Phrases.** Under the Sex Offender Commitment Act, a dangerous sex offender is defined as a person who suffers from a mental illness which makes him likely to engage in repeat acts of sexual violence, who has been convicted of one or more sex offenses, and who is substantially unable to control his criminal behavior, or a person who has a personality disorder which makes him likely to engage in repeat acts of sexual violence, who has been convicted of two or more sex offenses, and who is substantially unable to control his criminal behavior.
4. **Convicted Sex Offender.** Possession of sexually explicit images of children does qualify as a sex offense for the Sex Offender Commitment Act purposes.
5. **Mental Health: Convicted Sex Offender: Proof.** The State has the burden of proving by clear and convincing evidence that neither voluntary hospitalization nor other alternative treatment less restrictive than inpatient treatment would prevent a dangerous sex offender from harming himself or others.

Appeal from the District Court for Douglas County: Horacio J. Wheelock, Judge. Affirmed.

Thomas C. Riley, Douglas County Public Defender, and Ryan T. Locke for appellant.

Eric W. Wells, Deputy Douglas County Attorney, for appellees.

Riedmann and Bishop, Judges.

Per Curiam.

## I. INTRODUCTION

K.W. appeals from the order of the district court for Douglas County, affirming the decision of the Mental Health Board of the Fourth Judicial District (Board). The Board found K.W. to be a dangerous sex offender under the Sex Offender Commitment Act (SOCA), Neb. Rev. Stat. § 71-1201 et seq. (Reissue 2009), and ordered him to undergo inpatient treatment. On appeal, K.W. argues that the district court erred in affirming the Board's findings that he was a dangerous sex offender and that inpatient treatment was the least restrictive treatment alternative. We find no merit to K.W.'s arguments on appeal, and we affirm.

## II. BACKGROUND

The Douglas County Attorney filed a petition with the Board, alleging K.W. was a dangerous sex offender within the meaning of SOCA. The petition was filed based on a psychological evaluation conducted on K.W. by Dr. Alan Levinson, a clinical psychologist employed by the Nebraska Department of Correctional Services. The evaluation was conducted during the period immediately preceding K.W.'s completion of a sentence imposed by the Douglas County District Court for 10 counts of possession of child pornography. A hearing before the Board was held in February 2016. Dr. Levinson testified regarding a psychological evaluation

of K.W. he conducted in October 2015. In order to formulate his opinions and diagnoses, Dr. Levinson reviewed K.W.'s institutional file, mental health file, police reports, and presentence investigation; interviewed K.W.; and utilized actuarial diagnostic tools.

At the time of Dr. Levinson's evaluation, K.W. was serving 10 sentences for possession of child pornography. K.W. had been sentenced to five concurrent terms of 20 months' to 5 years' imprisonment on counts I through V, and five additional concurrent terms of 20 months' to 5 years' imprisonment on counts VI through X. K.W.'s total sentence was therefore 40 months' to 10 years' imprisonment. According to court documents, K.W. sent an image of child pornography via text message to a woman in Ohio. The woman contacted the authorities who were able to trace the telephone number to K.W. Police then searched K.W.'s cellular phone and located over 100 additional images of child pornography.

Dr. Levinson's report also stated that K.W. had been convicted of "[w]indow peeping" on five different occasions in the 1990's. K.W. described to Dr. Levinson looking in windows at adolescent and adult females, as well as adult males, in different sexual situations and masturbating to what he saw.

Dr. Levinson also testified regarding K.W.'s treatment history. Dr. Levinson testified that the Department of Correctional Services offers three levels of sex offender treatment. Following an evaluation, K.W. was placed into the highest level of treatment, a 2- to 3-year program for higher risk sex offenders referred to as the inpatient "Healthy Lives" sex offender program (iHeLP). K.W. started participating in iHeLP in February 2012, but was put on probation in the program in August 2014 due to a lack of progress. A report from August 2014 indicated that K.W. did not adequately manage risk factors, had volatile relationships with treatment staff and peers, and inconsistently demonstrated awareness of his mental health issues. Additionally, K.W. did not cooperate with supervision, including blaming his therapist for a lack of

perceived personal success in the program, rather than accepting constructive feedback or taking responsibility for his behavior. The August 2014 report stated that K.W. regressed into a stage of "'late contemplation'" from a stage of "'preparation'" due to not following through on his treatment. The report concluded that K.W. had "'minimal personal conviction toward working on [his] issues.'"

In September 2014, K.W. was ultimately terminated from the iHeLP program without completing it. The reasons for K.W.'s termination were "'treatment-interfering behaviors, interfering in the treatment of others, and lack of motivation.'"

From his review of K.W.'s institutional records, Dr. Levinson identified specific risks, needs, and issues for K.W., including impulsivity, irresponsibility, antisocial behavior, general social rejection, negative emotionality, poor insight and judgment, sex drive, sex preoccupation, sex as coping, and deviant sexual preference. Dr. Levinson also expressed concern regarding K.W.'s lack of veracity and consistency in self-reporting.

In assessing whether K.W. is a dangerous sex offender, Dr. Levinson also utilized actuarial diagnostic tools, specifically the "Static-99-R," the "Stable-2007," the "Hare Psychopathy Checklist-Revised," and the "Sex Offender Risk Appraisal Guide" (SORAG). The Static-99-R is a list of 10 factors related to sexual recidivism. Static-99-R results tend to stay static and not change over time. K.W. scored an 8 out of 12, which places him at a high risk for committing future sex offenses relative to other sex offenders. A score of 8 equates to approximately a 31-percent chance of sexually reoffending within 5 years.

The Stable-2007 assesses risk level and treatment needs by utilizing 13 risk factors. The factors assessed by the Stable-2007 are dynamic. The risk associated with them tends to change over time, especially when the person receives treatment. K.W. scored a 15 out of 26, which places him at a high risk overall to reoffend and at a high-need level for

treatment. Dr. Levinson identified a number of areas of concern for K.W. based on the Stable-2007 results, including capacity for stable relationships, impulsivity, sex drive, sex preoccupation, deviant sexual preference, lack of cooperation with supervision, hostility toward women, lack of concern for others, poor problem-solving skills, negative emotionality, and "sex as coping."

K.W. had previously been administered the Stable-2007 in March 2013 by a different care provider and had also received a score of 15. Dr. Levinson testified that it was concerning that K.W.'s score remained the same from 2013 to 2015, because he would expect a score to lower as an offender made progress in treatment.

Dr. Levinson also combined the Static-99-R and Stable-2007 scores to provide a broader idea of overall risk of recidivism. K.W.'s combined score placed him in the "very high risk" category.

The "Hare Psychopathy Checklist-Revised" assesses factors related to psychopathy. Dr. Levinson described a psychopath as "someone who is self-centered, self-indulgent, not particularly concerned with other people or any kind of rules . . . and tends to have the ability to manipulate others." K.W. scored 11 out of 40, which placed him as not having psychopathic traits.

The SORAG is a 14-item scale that predicts an offender's likelihood of engaging in violent behaviors, including sexually violent behaviors. K.W.'s score placed him between the fifth and sixth of nine "bins" where a score in the ninth bin is the highest risk level. Statistically, K.W.'s score showed a 45-percent chance of committing a violent offense within a 7-year period, and a 76-percent chance within a 10-year period.

Dr. Levinson also evaluated K.W. pursuant to the "criteria outlined in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition [and] Fifth Edition." He diagnosed K.W. with "pedophilia, sexually attracted to both males and

females[,] nonexclusive type"; "paraphilia, not otherwise specified with voyeuristic and pornographic tendencies"; posttraumatic stress disorder; and alcohol abuse. Dr. Levinson explained that K.W.'s diagnoses met the definition of mental illness under SOCA because they occurred over time, affected his mood, and impaired his abilities to interact socially and operate normally in society. Dr. Levinson also testified that K.W. suffers from a "personality disorder not otherwise specified with antisocial and borderline traits."

Based on K.W.'s diagnoses, Dr. Levinson opined that K.W. has the propensity to "engage in repeat acts of sexual violence" that would result in serious harm to others. Dr. Levinson based his opinion on the fact that K.W. has displayed a pattern of concerning behavior which makes it difficult for him to exist in a normal social setting, has committed crimes, and has displayed escalating actions over time.

In Dr. Levinson's opinion, inpatient treatment was the least restrictive treatment alternative for K.W., because without such treatment, K.W. would have serious difficulty in controlling or resisting his desire to commit future sex offenses. According to Dr. Levinson, only inpatient treatment would provide K.W. with the necessary amount of structure and support.

Dr. Mary Paine, a licensed clinical psychologist who had met K.W. and reviewed Dr. Levinson's evaluation, also testified at the hearing. Dr. Paine agreed with Dr. Levinson's assessment that K.W. was a dangerous sex offender. However, Dr. Paine believed that K.W. was an appropriate candidate for outpatient treatment. Dr. Paine opined that K.W. would do well in her outpatient treatment program because he wants to accept help and has nearly 2½ years in the iHeLP program. Dr. Paine acknowledged that K.W. scored at a high risk of recidivism on the actuarial assessments Dr. Levinson performed, but she testified that other factors were important as well, such as K.W.'s lack of violent offenses, his good base of treatment, his cooperative attitude, and her ability

to transfer K.W. to a higher level of care if necessary. Dr. Paine testified that she had developed an individualized treatment program for K.W., which included individual and group therapy immediately upon release; housing at a Christian halfway house for male sex offenders; strict rules regarding alcohol, drugs, and pornography; case management services; and polygraph tests.

At the conclusion of the hearing, the Board found by clear and convincing evidence that K.W. was a dangerous sex offender. The Board relied on K.W.'s diagnoses for mental illnesses (pedophilia, paraphilia, post-traumatic stress disorder, and alcohol abuse), as well as his diagnosis of a personality disorder. The Board also emphasized the testimony regarding K.W.'s impulsivity, lack of success in the iHeLP program, interfering with others during treatment, lack of motivation, and treatment-interfering behaviors. The Board noted that K.W. had been convicted of 10 counts of possession of child pornography. Lastly, the Board concluded that K.W. required inpatient treatment in accordance with Dr. Levinson's recommendation.

K.W. appealed the Board's decision to the district court. The district court affirmed, finding that the Board's decision was supported by clear and convincing evidence.

K.W. appeals to this court.

### III. ASSIGNMENTS OF ERROR

K.W. argues that the district court erred in affirming the Board's determination that K.W. is a dangerous sex offender and that inpatient treatment is the least restrictive alternative.

### IV. STANDARD OF REVIEW

[1,2] The district court reviews the determination of a mental health board de novo on the record. *In re Interest of S.J.*, 283 Neb. 507, 810 N.W.2d 720 (2012). In reviewing a district court's judgment under SOCA, an appellate court will affirm unless it finds, as a matter of law, that clear and convincing evidence does not support the judgment. See *id.*

## V. ANALYSIS

### 1. Dangerous Sex Offender

K.W. first argues that he does not qualify as a dangerous sex offender because his convictions were for noncontact sexual crimes and he has no history of violent offenses. We find no merit to K.W.'s argument.

[3] Under SOCA, a dangerous sex offender is defined as a person who suffers from a mental illness which makes him likely to engage in repeat acts of sexual violence, who has been convicted of one or more sex offenses, and who is substantially unable to control his criminal behavior, or a person who has a personality disorder which makes him likely to engage in repeat acts of sexual violence, who has been convicted of two or more sex offenses, and who is substantially unable to control his criminal behavior. Neb. Rev. Stat. § 83-174.01(1) (Reissue 2014). The State, through Dr. Levinson, presented evidence that K.W. met both definitions of dangerous sex offender. Dr. Paine agreed with Dr. Levinson's assessment. Nonetheless, K.W. argues that the State has failed to meet its burden. Therefore, we will address the statutory elements in turn.

### (a) Mental Illness or Personality Disorder

The first element the State was required to prove in order to show that K.W. is a dangerous sex offender is that he suffered from either a mental illness or a personality disorder which makes him likely to engage in repeat acts of sexual violence. See § 83-174.01(1). "Mentally ill" means having a psychiatric disorder that involves a severe or substantial impairment of a person's thought processes, sensory input, mood balance, memory, or ability to reason which substantially interferes with such person's ability to meet the ordinary demands of living or interferes with the safety or well-being of others. Neb. Rev. Stat. § 71-907 (Reissue 2009) and § 71-1203. "Person with a personality disorder" means an individual diagnosed with

a personality disorder. § 83-174.01(4). "Likely to engage in repeat acts of sexual violence" means that a "person's propensity to commit sex offenses resulting in serious harm to others is of such a degree as to pose a menace to the health and safety of the public." § 83-174.01(2).

The State introduced evidence that K.W. suffered from both mental illness and a personality disorder. In particular, Dr. Levinson testified that he had diagnosed K.W. with "pedophilia, sexually attracted to both males and females[,] nonexclusive type"; "paraphilia, not otherwise specified with voyeuristic and pornographic tendencies"; post-traumatic stress disorder; and alcohol abuse. Dr. Levinson explained that K.W.'s diagnoses met the definition of mental illness under SOCA because they occurred over time, affected his mood, and impaired his abilities to interact socially and operate normally in society. Dr. Levinson further diagnosed K.W. with a "personality disorder not otherwise specified with antisocial and borderline traits."

K.W. argues that because he has "no history of committing violent offenses," he is not likely to commit sexually violent acts in the future. Brief for appellant at 13. However, Dr. Levinson noted that K.W.'s behavior has escalated over time, from "[w]indow peeping" at adults and adolescents to downloading images of child pornography. Dr. Levinson testified that K.W. had a propensity to engage in repeat acts of sexual violence which would harm others because he had difficulty existing in normal social settings. Additionally, the SORAG placed K.W. at a 45-percent chance of committing a violent offense within a 7-year period, and a 76-percent chance within a 10-year period. As is discussed more fully in the next section, § 83-174.01(2) does not require that there be a predicate "contact" sex offense to classify a person as being "likely to engage in repeat acts of sexual violence." The testimony of both experts in this case established that K.W. qualified as a dangerous sex offender. Dr. Levinson concluded, based on K.W.'s poor performance in the iHeLP program, combined

with his testing results, that K.W. was likely to engage in repeat acts of sexual violence. We can find nothing in the pertinent statutes which would require a past "contact" offense as a necessary element to such a conclusion. Accordingly, we conclude there was clear and convincing evidence by which the Board could find that K.W. suffered from either a mental illness or a personality disorder which made him likely to engage in repeat acts of sexual violence.

(b) Convicted of Sex Offense(s)

The second element the State was required to prove in order to show that K.W. was a dangerous sex offender was that he had been convicted of at least one sex offense if he suffered from mental illness or at least two sex offenses if he suffered from a personality disorder. See § 83-174.01(1). The knowing possession of any visual depiction of sexually explicit conduct involving a child is a violation of Neb. Rev. Stat. § 28-813.01 (Supp. 2015) and qualifies as a sex offense under SOCA. Neb. Rev. Stat. § 29-4003 (Cum. Supp. 2014) and § 83-174.01(5). Therefore, K.W.'s 10 convictions for possession of child pornography are sex offenses for purposes of SOCA.

[4] K.W. argues that his convictions for possession of child pornography should not qualify because they are noncontact crimes and they were his first felony convictions. However, the Legislature has determined that possession of sexually explicit images of children does qualify as a sex offense for SOCA purposes. See § 29-4003. In light of the Legislature's express statutory intent, we are without authority to determine that K.W.'s offenses do not qualify as sex offenses as he argues. See *Coffey v. Planet Group*, 287 Neb. 834, 845 N.W.2d 255 (2014) (stating that appellate court will not look beyond statute to determine legislative intent when words are plain, direct, or unambiguous). The State presented clear and convincing evidence that K.W. had been convicted of at least two sex offenses as defined by SOCA.

### (c) Substantially Unable to Control
### His Criminal Behavior

The third element the State was required to prove in order to show that K.W. was a dangerous sex offender was that he was substantially unable to control his criminal behavior. See § 83-174.01(1). Being substantially unable to control one's criminal behavior means having serious difficulty in controlling or resisting the desire or urge to commit sex offenses. See § 83-174.01(6).

Dr. Levinson testified that K.W. struggled with impulsivity, poor insight and judgment, and irresponsibility. Additionally, K.W. was terminated from the iHeLP program due, in part, to his poor attitude and failing to adequately manage risk factors. Additionally, K.W.'s history showed repeated incidents of sexual offenses, escalating from "[w]indow peeping" on five occasions in the 1990's to the current charges of possession of child pornography. This constituted clear and convincing evidence by which the Board could find that K.W. was substantially unable to control his criminal behavior.

### 2. Inpatient Treatment

Lastly, K.W. argues that the district court erred in affirming the Board's determination that an inpatient program was the least restrictive treatment alternative. K.W. argues that the actuarial assessments are not accurate, because they are not individualized, and that other Nebraska SOCA cases requiring inpatient treatment involved sexual contact offenses, not possession of child pornography. We find no merit to this assignment of error.

[5] In addition to establishing that K.W. was a dangerous sex offender, the State has the burden of proving by clear and convincing evidence that neither voluntary hospitalization nor other alternative treatment less restrictive than inpatient treatment would prevent a dangerous sex offender from harming himself or others. See, Neb. Rev. Stat. § 71-1209 (Reissue 2009); *In re Interest of G.H.*, 279 Neb. 708, 781 N.W.2d 438 (2010).

The evidence at the hearing showed that K.W. had previously been unsuccessful in treatment. In particular, K.W. was discharged from the iHeLP program due to a lack of progress. K.W. did not cooperate well with supervision in the iHeLP program, blamed his therapist for his lack of progress, failed to take responsibility for his behavior, and regressed from a stage of "'preparation'" to a stage of "'late contemplation.'" K.W. had "'minimal personal conviction toward working on [his] issues.'" Additionally, K.W.'s discharge was due to his treatment-interfering behaviors, interfering with the treatment of others, and a lack of motivation.

The numerous actuarial tests Dr. Levinson administered all showed that K.W. was at a high risk of recidivism. Additionally, K.W.'s score on the Stable-2007 did not change from 2013 to 2015, a period which covered most of K.W.'s time in the iHeLP program. Dr. Levinson found the lack of change in K.W.'s Stable-2007 score to be concerning because an offender in treatment would usually expect to lower his or her score over time. The evidence of K.W.'s aversion to past treatment efforts supports the Board's determination that anything less restrictive than inpatient treatment would not be effective.

K.W. argues that the actuarial tests were poor tools because they were not individualized assessments. However, Dr. Levinson's recommendation for inpatient treatment did not rely solely on K.W.'s high scores on the actuarial assessments, but also on K.W.'s lack of success in the iHeLP program and his need for structure and support. There was clear and convincing evidence that neither voluntary hospitalization nor other alternative treatment would prevent K.W. from harming himself or others.

K.W. also argues that there are no other SOCA cases in which an offender was committed to inpatient treatment based on a noncontact offense such as possession of child pornography. However, K.W. points to nothing in the SOCA statutes which prohibits inpatient treatment for offenders who commit

the possession of child pornography. Rather, the proper test, as set forth above, is whether inpatient treatment was the least restrictive option which would prevent K.W. from harming himself or others. The State met its burden of proving that it was.

## VI. CONCLUSION

We conclude that clear and convincing evidence supports the Board's determinations that K.W. is a dangerous sex offender and that inpatient treatment is the least restrictive treatment alternative. We therefore affirm the district court's order affirming the Board's decision.

AFFIRMED.

ARTERBURN, Judge, participating on briefs.